Robert W. Lannan (D.D.C. Bar No. 454965)
Lannan Legal PLLC
Washington, D.C. 20006
Telephone: (202) 223-8901
e-mail: robert.lannan@lannanlegal.com

*Proposed Counsel to the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

In re:

**REPMGMT INC. CHARTERED**,                                        Case No. 23-00375
d/b/a Fireside Campaigns,
                                                                   Chapter 11

    Debtor

## DEBTOR'S RESPONSE TO THE OBJECTION OF THE
## ACTING UNITED STATES TRUSTEE TO DEBTOR'S
## <u>APPLICATION TO EMPLOY LANNAN LEGAL PLLC AS COUNSEL</u>

RepMGMT, Inc. Chartered, d/b/a Fireside Campaigns (the "**Debtor**"), the debtor and debtor in possession in the above-captioned case (this "**Case**"), by and through its undersigned proposed counsel ("**Counsel**"), submits this response (the "**Response**") to the objection (the "**Objection**") of the Gerald R. Vetter, Acting United States Trustee for Region 4 (the "**U.S. Trustee**") to the Debtor's amended application (the "**Application**") to employ Lannan Legal PLLC (the "**Firm**") as its bankruptcy counsel. As its Response, the Debtor respectfully states as follows:

## <u>GOVERNING AUTHORITIES</u>

1.    A debtor in possession has an "inherent right . . . to employ the counsel of [its] choice subject to the restrictions of" Section 327(a) of the Bankruptcy Code, as applied by the Court. *In re Diamond Mortgage Corp. of Ill.*, 135 B.R. 78, 92 (Bankr.N.D.Ill. 1990). "Only in the rarest of cases will the trustee be deprived of the ability to select qualified counsel, for the relationship between attorney and client is highly confidential, demanding personal faith and confidence in order that they may work together harmoniously." 3 *Collier on Bankruptcy* ¶ 327.04, [1] (*quoting Schwartz v, Geltzzer* (*In re Smith*), 507 F.3d 64, 69 (2d Cir. 2007)).

1

2.      Subject to the Court's approval, a debtor in possession may employ professional firms that "do not hold or represent an interest adverse to the estate, and that are disinterested persons[.]" 11 U.S.C. § 327(a).  To be a "disinterested person," among other requirements that have not been called into question in response to the Application, a person must "not have an interest materially adverse to the interest of the estate . . . for any . . . reason."  11 U.S.C. § 101(14)(C).  "Courts have recognized that there is an overlap in the two prongs of section 327(a)[.]"  3 *Collier on Bankruptcy* ¶ 327.04, [2].  Both refer to interests adverse to the estate (in the second, "materially adverse").  At least one court has held that the two prongs therefore "form a single test to judge conflicts of interest." *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr.S.D.N.Y. 1998).

3.      Section 327(a) is phrased in the present tense.  This has led some courts to take the position that "counsel will be disqualified under section 327(a) only if it presently 'holds or represents an interest adverse to the estate," notwithstanding any interests it may have held or represented in the past."  *Bank Brussels Lambert v. Coan* (*In re AroChem Corp.*), 176 F.2d 610, 623 (2d Cir. 1999); *see also In re Wiredyne, Inc.*, 3 F.3d 1125, 1127 (7th Cir. 1993) ("By [its] terms . . . section[ ] appl[ies] only to professionals employed by a trustee and [is] not applicable to conflicts occurring prior to the order of relief, after which time court approval is required for employment of counsel.")

4.      Irrespective of the timing of a conflict of interest, courts have also explored the degree of conflict required to disqualify a professional.  In his Objection, the U.S. Trustee encourages this Court to apply a strict standard, expressed in three different ways in four cases cited in the Objection. The first variant of this standard would disqualify a lawyer for merely the "perception of a potential conflict," if that perception "renders the lawyer's interest materially adverse to the estate or to the creditors of the estate."  Objection ¶ 19 (quoting *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987).  A second expression of the standard would disqualify an attorney for "the appearance of impropriety." Objection ¶ 24 (quoting *In re 7677 E. Berry Ave. Assoc., L.P.*, 419 B.R. 833, 845 (Bankr.D.Colo.

2009.)  A third would "prevent the retention of a professional who in the slightest degree might have some relationship that would color the independent and impartial attitude required by the Code." Objection ¶ 24 (*quoting In re Consolidated Bancshares Inc*., 785 F.2d 1249, 1256 (5th Cir. 1986) and *In re Am. Intern. Refinery, Inc*., 436 B.R. 364, 372 (Bankr.W.D.La. 2010)).

5.      However, the interpretation of Section 327 as being "intended to prevent even the appearance of conflict . . . . has not been widely followed."  3 *Collier on Bankruptcy* ¶ 327.04 at [2][a][iii][E] (internal citations and quotation marks omitted).  For example, in the case *In re Marvel Entertainment Group, Inc*., 140 F.3d 463 (1998), the U.S. Court of Appeals for the Third Circuit announced the following approach:

> (1) Section 327(a) . . . imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) . . .— disqualify an attorney who has a potential conflict of interest and (3) **the district court may not disqualify an attorney on the appearance of conflict alone**.

140 F.3d at 476 (emphasis added).  The court in *Marvel* further stated, "[I]t must be made clear that horrible imaginings alone cannot be allowed to carry the day.  Not every conceivable conflict must result in sending the trustee away to lick his wounds."  *Id*. at 477 (internal citations, quotation marks and interpolations omitted).

6.      Even under the more stringent standards applied by the four cases on which the U.S. Trustee relies, there is room for a court to look behind circumstances that initially seem questionable and ultimately conclude that there is no basis for disqualifying a professional.  In none of the four opinions cited by the U.S. Trustee did the courts disqualify the attorneys under scrutiny.  In the two appellate opinions he cites, the courts called for further investigation.  In the two bankruptcy court opinions, the courts ruled in favor of the law firms on the issue of whether they should be disqualified under Section 327(a).

a.        *Martin* involved a law firm representing a couple who filed a Chapter 11 case as individuals.  817 F.2d at 176.  To secure its prepetition and post-petition fees, on the same day the law firm filed its clients' petition, it recorded a mortgage for itself in a property the couple owned, making itself a secured creditor of the estate.  817 F.2d at 176.  This and other issues presented in the case made their way through appeals to the U.S. Court of Appeals for the First Circuit.  The appellate court could have applied the "perception of a potential conflict" standard to facts already in the record and concluded that the law firm was disqualified.  Instead, it stated, "[W]e do not find that the grant of the Mortgage to the law firm as security for payment of its fees was impermissible *per se*."  *Id*. at 183.  The court reasoned, "The naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but  makes it voidable as the facts may warrant," and added that "[t]his inquiry is of necessity case-specific."  *Id*. at 182.  The court noted that "bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals."  *Id*.  It then vacated a judgment that had been entered partially against the interest of the law firm and remanded the case.  *Id*. at 176 and 183.

b.        In *Consolidated Bancshares*, a group of shareholders of a debtor contested a bankruptcy court's award of fees to one of the debtor's attorneys, on grounds that he had represented at least one of the debtor's directors in litigation and continued to represent an officer and director of the debtor.  785 F.2d at 1255.  The attorney had confirmed the latter representation on the record at a hearing.  *Id*.  On appeal, the U.S. Court of Appeals for the Fifth Circuit noted that the then-current (1985) edition of *Collier on Bankruptcy* included the above-quoted language that would "disqualify anyone who in the slightest degree might have some interest or relationship . . ."  *Id*. (*quoting* 2 *Collier on Bankruptcy* § 327.03 at 327-19,

20 (15th ed. 1985).[1]  However, it did not simply apply that standard to the undisputed facts

and reverse the lower court's award of the fees.  It remanded the case, noting that the

bankruptcy court would  need to apply "painstaking analysis of the facts . . . . in order to

elucidate whether [the attorney's] admitted dual representation created a legally disabling

conflict of interest." *Id*. at 1256 (internal citations and quotation marks omitted).

     c.    *American International Refinery* involved a pair of affiliated debtors that

caused one of their non-debtor subsidiaries to borrow $200,000 from the debtors' largest

secured creditor, in exchange for security interest in certain assets, and to forward the loan

proceeds to a law firm to be used as a retainer for representing the debtors in their bankruptcy

case.  436 B.R. at 373.  A plan of reorganization was later confirmed in the case, under which

a liquidating trust was formed and a trustee appointed.  *Id*. at 371.  The trustee believed that

prepetition and before confirmation, the law firm caused the debtor to give favorable treatment

to the secured creditor that had financed the retainer.  He brought an adversary proceeding

against the law firm seeking disgorgement of its fees.  The court considered whether the credit

facility funding retainer caused the firm to hold an "adverse interest" or to be a "disinterested

person" under Section 327(a) of the Bankruptcy Code.  *Id*. at 373.  The court discussed case

law applying the statute, including *Consolidated Bancshares* (quoting the above language:

"who in the slightest degree might have some relationship . . ."). *Id.* at 372.  After applying

this and other case law to the facts, the court "conclude[ed] that [the secured creditor's]

funding of [the law firm's] retainer did not create a disqualifying conflict of interest." *Id*. at

374.  The court also rejected the trustee's arguments that the law firm had breached its duties

to the estate in its dealings with the secured creditor prepetition and before confirmation of

the plan.  *Id.* at 376-78.  Finally, returning to Section 327, the court "conclude[ed] that [the

---

[1] The language quoted in paragraph 5 of this Memorandum is from the current edition of *Collier on Bankruptcy*.

law firm] did not have a disqualifying interest as a result of its prior representation of the [d]ebtors" in certain pre-petition transactions. *Id*.[2]  The bankruptcy court's decision was affirmed by both the U.S. District Court for the Western District of Louisiana and the U.S. Court of Appeals for the Fifth Circuit. *In re Am. Int'l Refinery, Inc*., 676 F.3d 455 (2012).

d.    *In re 7677 East Berry Ave.* involved a group of jointly administered debtors that applied to employ a law firm. 419 B.R. at 837.  A creditor objected to this on multiple grounds, including that the law firm had a substantial pre-petition claim against the debtors for unpaid legal fees, which it conveyed to another of the debtors' creditors in exchange for a promissory note and deed of trust, becoming "a creditor of a creditor." *Id*. at 840.  In considering this objection, the court provided a lengthy discussion of the "appearance of impropriety" standard, *Id*. pp. 845-47, which includes the following statement:

> [W]hile avoidance of the appearance of impropriety should be a component of evaluating the employment of counsel, a bankruptcy court must use its discretion to determine whether such an appearance is fatal.
>
> In exercising discretion on this issue, the Court recognizes it is possible in countless cases an attorney could hold some relationship which could be seen as creating such an appearance of impropriety.  For example it could be argued [that] if an attorney or a member of his firm held a personal account at a creditor bank, an appearance of impropriety existed.  Such an interpretation would lead to absurd and damaging results, because some de minimis or tangential relationship could disqualify nearly any attorney in any case.
>
> * * *
>
> Thus, this Court does not adopt any *per se* rule that *any* appearance of impropriety is a bar to employment, but must examine the particular circumstances of each case.

---

[2] While ruling in the law firm's favor on issues of whether it was subject to disqualification under Section 327(a), the bankruptcy court did sanction the law firm for failing to adequately disclose its connections with the debtor's largest secured creditor.  436 B.R. 379-80.

*Id*. at 847.   The Court rejected all of the creditor's arguments, overruled its objection and approved the Debtor's application to employ the law firm.  *Id*. at 855.

7.      In his present Objection, the U.S. Trustee makes no allegation that the Firm "holds" an interest adverse to the Debtor's estate, such as an equity interest in a creditor.  (It does not.)  Rather, the U.S. Trustee believes the Firm has *represented* an interest adverse to the estate.  The Bankruptcy Code does not define the terms "represent" or "representation."  In two bankruptcy cases, court have noted that under a *Black's Law Dictionary* definition, "'representing' requires that one simply act on behalf of another."[3]  *In re Washington Mutual, Inc.*, 419 B.R. 271, 275 n. 8 (Bankr.D.Del. 2009); *In re Philadelphia Newspapers, LLC*, 422 B.R. 553, 566 (E.D.Pa. 2010).   More precisely, other bankruptcy courts have defined the term "represent an adverse interest" as "to serve as agent or attorney for an individual or entity holding such an adverse interest."  *In re Roberts*, 46 B.R 815, 826-27 (Bankr.D.Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D.Utah 1987) (en banc), *quoted in In re 7677 East Berry Ave. Assoc., L.P.*, 419 B.R. 833; *accord In re Diamond Mortgage Corp. of Ill*., 135 B.R. at 95.

8.      In his Objection, the U.S. Trustee refers to three events that he believes signal that the Firm has represented an interest adverse to the estate, creating a conflict of interest that disqualifies the Firm from representing the Debtor in this Case.  For reasons discussed below, he is mistaken with respect to all three of these events.

## 1.  <u>WORK ON THE BAUMAN CREDIT FACILITY</u>

9.      The U.S. Trustee contends that the Firm is disqualified because of prepetition work it did in support of a credit facility agreed to between, on the one hand, the Debtor and, on the other hand, Mr. Bauman and his wife. The U.S. Trustee correctly observes that "Bauman and his wife

---

[3] The full statement in *Black's Law Dictionary* is, "To represent a person is to stand in his place; to speak or act with authority on behalf of such person; to supply his place; to act as his substitute or agent."  *Black's Law Dictionary* 1301 (6th ed. 1990).

agreed to personally lend money to the Debtor [in order for the Debtor] to make the final paycheck payments to the employees laid off in October 2023[,]" and that "Bauman and his wife agreed to make th[is] loan only if they could secure and perfect their loan to maximize their chances of repayment from the Debtor." Objection ¶ 11. He also correctly notes that "[t]he Firm drafted the security agreement and UCC-1 financing statement to secure this debt[.]" *Id.*

10.     Where the U.S. Trustee faults is in assuming that the Firm did this work "for Bauman and his wife," *Id*., and not for the Debtor. Based on this assumption, the U.S. Trustee leaps to three conclusions in paragraph 23 of his Objection:

> [1] In this case, proposed counsel performed work **on behalf of the Debtor's sole owner and his wife**[:] the preparation, finalizing, and perfection of a pre-petition loan . . . . [2] The work completed to secure and perfect the loan benefited the principal and his wife, **not the Debtor**. [3] This is a **direct conflict of interest** . . .

Id. ¶ 23 (emphasis added). Each of these conclusions is mistaken.

11.     To begin, neither the Firm nor Counsel ever performed work "on behalf of the Debtor's sole owner and his wife." Counsel worked on the credit facility on behalf of the Debtor. It is true that credit facility extended benefits to Mr. Bauman and his wife. However, it also benefited the Debtor. In fact, it was indispensable to the Debtor. Mr. Bauman and his wife made it clear that they would not extend a loan to the Debtor if they could not maximize their chances of repayment. The Debtor badly needed the money to pay the final paychecks of eighteen employees it had laid off. Without the money, the Debtor would have incurred a significant liability to these employees. (The District of Columbia Wage Payment and Collection Law provides that an employer can be liable for up to treble damages for wages it fails to pay. *See* D.C. Code § 32-1303(4).) It would have been impossible for the Debtor to secure credit, especially within such a short timeframe, from any other source. The Debtor therefore instructed Counsel to draft a security instrument and

financing statement that were essential to its survival.[4]

12.    Like all attorneys who work on transactions, when Counsel drafts legal instruments, these are usually documents that will be signed by both his own clients and adverse counterparties. These instruments always include some provisions (sometimes entire instruments within a suite of documents) that benefit the counterparties more than Counsel's clients.   Other provisions primarily benefit Counsel's clients.   Similarly, Counsel frequently advises his clients on concessions they can offer to counterparties in exchange for consideration valuable to Counsel's clients.   It would be wrong to conclude that, in performing these acts, Counsel is "act[ing] on behalf of" his clients' counterparties, W*ashington Mutual, Inc.*, 419 B.R. at 275 n. 8, "serv[ing] as agent or attorney" for them, *Roberts*, 46 B.R at 826-27, or otherwise "representing" them in these transactions.   Rather, he is performing legal services on behalf of his clients, in support of transactions that are mutually beneficial to them and their counterparties.   This is not "serving two masters."[5]   Objection ¶ 25.   It is serving *one* master by supporting a transaction that is mutually beneficial to that master and its counterparties.   This is the essence of transactions.   If transactions were not mutually beneficial, parties would not make them.   If they did not include consideration beneficial to all sides, they would not be enforceable.   If an attorney's support of a client by advancing a mutually beneficial transaction in this manner were a conflict of interest, this would make transactional legal practice impossible.

13.    Courts and other authorities have recognized this.   One instructive case is *Dolan v. Hickey*, 384 Mass. 234 (1982).   This case involved a real estate transaction in which an attorney was engaged by a bank lending money to the buyers.   *Id*. at 235.   The attorney also had some ownership

---

[4] To save on fees, the Debtor drafted the promissory notes within this credit facility itself, using a form drafted by one of its previous attorneys as a template.   Otherwise, Counsel would have drafted those instruments as well.

[5] As noted in paragraph 25 of his Objection, the U.S. Trustee draws the "serving two masters" language from *In re Am. Intern. Refinery, Inc*., 436 B.R. 364.   Immediately after the language the U.S. Trustee quotes, the court in *Am. Intern. Refinery* cited three cases and summarized circumstances that created conflicts of interest in each.   *Id*. at 374.   Two cases involved dual representations.   *Id*.   The third involved a debtor's principal paying an attorney and promising future payments in exchange for forwarding fees approved by the court.   *Id*.   Neither circumstance exists in the present Case.

interest in the lender, as well as the seller. *Id*. The attorney drafted a promissory note and a mortgage securing the lender's interest in the real estate. *Id*. at 225-36. The buyers did not engage their own counsel in this transaction. *Id*. at 36. They later defaulted on the mortgage *Id*. at 235. The lender foreclosed on the property and brought an action against the buyers for a deficiency. *Id*. As a defense, the buyers argued that the lender's attorney "was acting as a fiduciary and obligated to disclose his interest and advise the [buyers] to seek independent counsel." *Id*. at 236. The Court rejected this argument, explaining, "The possibility that the [buyers] . . . trusted [the attorney], and relied on his expertise in permitting him to draft the documents, does not establish a relationship of confidence. None of the facts reported suggests that an attorney-client relationship, or other confidential relationship, arose . . ." *Id*. (internal citations omitted). The court continued, "Because there was no attorney-client relationship between [the attorney] and the [buyers] . . . the rules concerning representation of multiple clients are inapplicable. Nor did [the attorney] 'give advice' to unrepresented parties with interests adverse to those of a client . . . The acts of drafting documents and presenting them for execution, without more, do not amount to 'advice,'' and are proper so long as the attorney does not engage in misrepresentation or overreaching." *Id*. at 236-37 (citing ABA Comm. On Professional Ethics, Opinions, No. 102 (1933) and ABA Comm. On Professional Ethics, Informal Opinions, No. 1269 (1973)).

### Absence of Opposing Counsel

14.     In the present Case, the U.S. Trustee correctly surmises that Mr. Bauman and his wife were not represented by their own counsel in the negotiation of the credit facility. Objection ¶ 12. This is because they could not afford an attorney. The collapse of the Debtor has caused the couple extreme financial hardship. In fact, Mr. Bauman and his wife took a personal loan of about $60,000 (nearly half the amount of Mr. Bauman's total compensation from the Debtor in 2022) to generate the funds they loaned to the Debtor in the above credit facility. Neither could the Debtor, at the

time, have afforded to pay for a second lawyer to represent the couple in this transaction.

15.    Like many transactional attorneys, from time to time, Counsel advises and represents clients in negotiation of instruments whose counterparties are not represented by attorneys. This is often because a counterparty cannot afford an attorney. It does not cause a conflict of interest for a lawyer to represent a client in such a transaction. *See* D.C. Rule of Professional Conduct 4.3. If it did, this too would make much transactional practice impossible, especially among small businesses.

16.    In situations in which Counsel represents an organizational client and interreacts with an officer or employee of that client on a matter in which the interests of the client and the officer or employee are or may become adverse, Counsel makes it a practice to give the officer or employee an "*Upjohn* warning" that Counsel's client is the organization and not the individual. In the present case, neither Counsel nor Mr. Bauman has any specific recollection of Counsel having done this. That does not mean that he failed to do so. Again, it is his practice to do so.

17.    In any event, Counsel had no obligation to issue an *Upjohn* warning in this situation. Rule 4.3 of the District of Columbia Rules of Professional Conduct addresses situations in which an attorney deals with an unrepresented person. Rule 4.3(b) states, "When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in this matter the lawyer shall make reasonable efforts to correct the misunderstanding." Counsel had no reason to suspect that Mr. Bauman misunderstood his role as an attorney for the Debtor, and not for Mr. Bauman and his wife. Only three months earlier, Mr. Bauman had signed an engagement agreement with the Firm in which its client was clearly identified as the Debtor. Application Exhibit A p. 1. Mr. Bauman's signature in that Agreement appears below the heading "RepMGMT Inc. Chartered d/b/a Fireside Campaigns," and above the title "Partner and CEO." *Id*. p. 2. In no place does the engagement agreement hint that Mr. Bauman or any member of his family could be a client of the Firm. At no point in time did Mr. Bauman or his wife sign any instrument suggesting that the

Firm represented either of them.

18.     Since 2018, Mr. Bauman has been the chief executive officer of a corporation that, at its height, had five shareholders, five directors, five officers, over seventy employees, and annual revenues of over $10 million.  During this period, the Debtor engaged several attorneys for various purposes.  Mr. Bauman did not fit the profile of "one not experienced in dealing with legal matters," which Rule 4.3(b) was written to protect.  *Id*. comment 1; *see also U.S. Soccer Fed'n Foundation, Inc. v. U.S. Soccer Fed'n., Inc*. 2019 WL 4673718 at *5 n. 5 (D.D.C. 2019) (declining to apply Rule 4.3(b) in part because the parties involved were "sophisticated").

19.     Moreover, when the Debtor engaged the Firm to advise on its restructuring, Mr. Bauman was not its only officer and director.  The Debtor had three other officers and directors who interviewed Counsel and were involved in the Debtor's decision to engage the Firm.  Particularly within this context, it would be absurd for a professional with Mr. Bauman's experience to fail to understand that Counsel's only client was the Debtor.

20.     Furthermore, before the subject of a credit facility ever surfaced, Counsel advised Mr. Bauman, in his capacity as the President of the Debtor, of his fiduciary duties to creditors due to the Debtor's insolvency.[6]  Therefore, when the credit facility was later discussed, Mr. Bauman was well aware that the Debtor was not an *alter ego* of himself, despite the fact that by then he was its only shareholder.  Mr. Bauman is sophisticated enough to understand that under those circumstances, Counsel could not have represented both the Debtor and him personally when drafting loan documents.

21.     Finally, Mr. Bauman has attested in his declaration attached to the Application as Amended Exhibit G (the "**Bauman Declaration**") that he has never understood Counsel to be his personal attorney or to represent his wife, and has always understood him to be the Debtor's attorney.

---

[6] Counsel recalls this because of notes made in advance of this meeting, which covered several subjects.

*Id*. ¶ 8.  The above facts make this attestation highly credible.

### Filing of UCC Financing Statement

22.     One of the steps the Firm took to support the above credit facility was to arrange for

the filing of a UCC-1 financing statement that perfected the security interest of Mr. Bauman and his

wife in the Debtor's assets.  The U.S. Trustee has singled out this action in paragraph 21 of his

Objection.   In response, the Debtor submits that appending an attorney's name and contact

information as the "submitter" of a  UCC-1 form is much different than signing a pleading filed in

a court.  To begin, the "submitter" of a UCC-1 need not be an attorney.

23.     Moreover, the UCC-1 form itself does not treat the "submitter" as a party to the

transaction or even a person of significance.  The first two lines in the "submitter" box ("A. NAME

AND PHONE NUMBER OF CONTACT AT SUBMITTER" and "B. EMAIL CONTACT AT

SUBMITTER") are marked as "optional."   More significantly, the third line ("C. SEND

ACKNOWLEGEMENT TO: (Name and Address)") is distinguished from the "SECURED PARTY

CONTACT INFORMATION," for which the reader is instructed to "SEE BELOW."   The

"DEBTOR" is identified in yet another section of the form.  There is no indication anywhere in the

form (or its instructions) that the SUBMITTER is associated with either the SECURED PARTY or

the DEBTOR.

24.     As a convenience to the parties, and in support of a transaction beneficial to the

Debtor, the Firm sent the UCC-1 to Corporation Service Company, with which the Firm has an

account, to be delivered to the Washington, D.C. Recorder of Deeds.  This was a ministerial function

akin to dropping a postcard in a mailbox.

25.     In a variety of contexts, courts have held that conflicts of interest do not result from

attorneys and other professionals performing merely "ministerial" acts.  These have included note-

taking during scheduling conference by a judicial law clerk who later worked at a law firm

representing a party in the same case, *Keyhani v. Chance*, 1988 WL 109100 at *2 (E.D.Pa. 1988); exercising a limited power of attorney granted by the FDIC to process a loan, *LNV Corp. v Maib*, 504 Fed.Appx. 804, 808 (11th Cir. 2013); performing "only ministerial accounting functions" for an ERISA plan, *Consolidated Beef Ind., Inc. v, New York Life Ins. Co.*, 949 F.2d 960, 964-56 (8th Cir. 1991), *cited in In re Express Scripts Inc., PBM Litigation*, 2008 WL 2952781 at *2 (E.D.Mo, 2008); and even entering an appearance on behalf of a client during the initial proceeding of a case. *Atlantic Leasing & Financial, Inc. v. IPM Technology, Inc*., 885 F.2d 188, 195 (4th Cir. 1989).  In one notable case, *Cheswell, Inc. v. Premier Homes and Land Corp*., 319 F.Supp.2d 144 (D.Mass. 2004), the court concluded that if an attorney representing the mortgagor in a real estate transaction had promised to record the mortgage to secure the interest of his client's counterparty, "he would have offered to undertake a ministerial task only, not advice that amounts to a potential conflict of interest."  Id. at 151.

26.     Most notably, at least three courts have described "the filing of a [UCC] financing statement" as "a ministerial act."  *Reedsburg Utility Comm'n. v. Grede Foundries, Inc.* (*In re Grede Foundries, Inc.*), 651 F.3d 786,791 (7th Cir. 2011);  *Makoroff v. City of Lockport*, 916 F.2d 890, 892 (3d Cir. 1990); *City of White Plains v. A&S Galleria Real Estate Inc*. (*In re Federated Dep't Stores, Inc*.), 243 B.R. 341 (Bankr.S.D.Ohio 2000) (*rev'd on other grounds*, 270 F.3d 994 (6th Cir. 2001)); *see also In re Carpenter Contractors of America, Inc*., 2009 WL 10818131 at *11 (Bankr.S.D.Fla. 2009).

## 2.  <u>DECISION NOT TO SEEK TO AVOID BAUMAN SECURITY INTEREST</u>

27.     The U.S. Trustee also contends that the Firm is conflicted because of the Debtor's decision not to seek to avoid security interests it conveyed to Mr. Bauman and his wife during the 90-day period before the Petition Date.  Counsel has supported that decision not because it is favorable to Mr. Bauman and his wife, but because he believes they would have a defense to any

such action.

28.     Section 547(b) of the Bankruptcy Code imposes on the Debtor an affirmative obligation to "tak[e] into account a party's known or reasonably knowable affirmative defenses under subsection [547](c)" before it proceeds with an action to avoid a preferential transfer.  The Debtor and Counsel would neglect this obligation if they did not consider this with respect to the Debtor's transfer of a security interest to Mr. Bauman and his wife.  Counsel believes the couple has at least one affirmative defense under Section 547(c).  Under Section 547(c)(1), the Debtor's transfer of a security interest under the credit facility was both "(A) intended by the [D]ebtor and [the couple] to be a contemporaneous exchange for new value given to the [D]ebtor; and (B) "in fact a substantially contemporaneous exchange."  The transfer was also perfected well within 30 days after it took effect.  11 U.S.C. § 547(e)(2)(A).

## Proposed Compromise

29.     While reserving the above arguments, the Debtor would be willing to agree to the suggestion of the  U.S. Trustee (*see* Objection ¶ 23) that the Debtor engage other counsel for the limited purpose of assessing whether a preference action against Mr. Bauman and his wife is appropriate, and pursuing one if he or she believes it is.  This should prevent any mistaken "perception of a potential conflict," *Martin*, 817 F.2d at 182, "appearance of impropriety," *7677 East Berry Ave.*, 419 B.R. at 845, or possibility of "some relationship that would color the independent and impartial attitude" of Counsel, *Consolidated Bancshares Inc.*, 785 F.2d at 1256, caused by the Firm having worked on the credit facility.  This can be done without disqualifying the Firm from representing the Debtor in other respects in this Case.

## 3.  FINANCING OF THE DEBTOR'S FEES BY BRADLEY BAUMAN AND AUTUMN CAMPBELL

30.     The U.S. Trustee also contends that the Firm is conflicted because, out of the $25,500

that the Debtor paid the Firm for its prepetition services, $5,500 was financed by Mr. Bauman and

his wife.  As noted in the Application, on one occasion, Mr. Bauman made a $3,000 credit card

payment to the Firm, and on another his wife made a $2,500 credit card payment to the Firm.  *See*

Application ¶ 22.  However, in neither instance was this the end of the transaction.  For each of these

transfers, the Debtor concurrently executed a promissory note in favor of Mr. Bauman and his wife.

*Id.*  This second step both acknowledged the independent corporate identity of the Debtor from that

the couple, and provided a  means for the Debtor to be the ultimate source of this funding.

31.    Both of these payments were financed in this manner out of practical necessity.  This

was a period when the Debtor frequently had negative bank account balances.  Even when it had cash

in its bank account, it was difficult to know when a creditor would sweep the cash away pursuant to

an ACH authorization.  If Mr. Bauman and his wife had loaned the funds directly to the Debtor, to

be forwarded from its account to the Firm, there is a very good chance that the Firm would never

have received them.

32.    Given these facts, it does not paint a complete picture to state that Mr. Bauman and

his wife "paid the Firm" a portion of its prepetition fees.  Objection ¶ 9.  A more accurate statement

would be that they "financed" these payments.  The Debtor made these payments to the Firm by

providing promissory notes to Mr. Bauman and his wife, in exchange for which they forwarded the

funds to the Debtor's intended recipient (as lenders often do in transactions).

33.    Even if Mr. Bauman and his wife had paid for the Firm's services to the Debtor

without receiving or expecting any form of compensation from the Debtor in return, this would not

disqualify the Firm from representing the Debtor in this Case.  From time to time, attorneys are

engaged to represent parties in transactions but paid by counterparties to the same transactions.[7]  This

---

[7] For example, many franchise agreements require that if a franchisor is going to transfer an interest in the franchised business, it must negotiate and enter into a new instrument with the franchisor, and must pay the franchisor's legal fees to negotiate that instrument.  *See, e.g.* Franchise Disclosure Document, Taco Bell Franchisor, LLC, issued March 27,

does not, per se, result in a conflict of interest.  *See* D.C. Rule of Professional Conduct 1.8(e).

34.     In bankruptcy cases, several courts have explored cases in which third parties have paid retainers to attorneys to represent Debtors.  "As for payment of a retainer by a third party, the majority of courts do not find that it is a *per se* rule for disqualification or deem the professional not interested."  *In re EZ Links Golf, LLC*, 317 B.R. 858, 863 (Bankr.D.Colo. 2004), *quoted in In re 7677 East Berry Ave. Assoc., L.P.*, 419 B.R. at 844.  Courts rejecting the *per se* approach "have held that the totality of circumstances surrounding the retainer payment must be scrutinized before deciding if a disqualifying conflict exists."  *In re American Int'l Refinery Inc.*, 676 F.3d a 462 ("adopt[ing] the totality of the circumstances approach for deciding whether third-party payment of a retainer creates a disqualifying interest").

35.     Circumstances that the Court should consider in the present Case include the following:

a.     The transfers by Mr. Bauman and his wife constituted less than 22% of the fees paid to the Firm for prepetition services.  The remainder were paid directly by the Debtor.

b.     The Firm was not a party to the credit facility that funded the transfers.  *In re Am. Intern Refinery, Inc*., 436 B.R. at 374.

c.     The Firm did not convey, or agree to convey, any value to the couple.  *Id*.

d.     The couple had not agreed to finance, fund or guarantee any post-petition services.  *Id*.

e.     The arrangement was fully disclosed to both the couple and the Debtor.  *See 77 E. Berry Ave. Assoc.*, 419 B.R. at 844.

f.     The Debtor has disclosed the arrangement to the Court.  *Id.*

---

2023, p. 18, available at <https://www.wdfi.org/apps/franchiseSearch/MainSearch.aspx >.  ("A transfer of all or a portion of your interest in any Unit is subject to a transfer fee.  Minimum fees are . . . subject to increase for costs incurred by us, including but not limited to our outside counsel fees, in connection with reviewing and effecting the transfer.")

g.      As discussed above, the Debtor executed instruments committing to repay these amounts to Mr. Bauman and his wife.

h.      There is no understanding between the Firm and the couple, express or implied, that the firm will fail to commit its undivided loyalty to the Debtor in this Case. *See In re Missouri Mining Inc.*, 186 B.R. 946, 949-50 (W.D.Mo. 1995), *cited in In re Lotus Properties, LP*, 200 B.R. 288, 394 (Bankr.C.D.Cal. 1996).

## AFFORDABILITY OF SUBCHAPTER V CASES TO SMALL BUSINESSES

36.     Last October, when the Debtor was negotiating the credit facility with Mr. Bauman and his wife, if the couple had engaged their own attorney to represent them in the transaction, the U.S. Trustee would probably have not filed his Objection.  Unfortunately, as noted above, the couple could not afford this.  They were already borrowing $60,000 from friends to lend to the Debtor under the credit facility.  Neither could the Debtor, which often had a negative balance in its operating account, afford to pay for a second attorney to represent the couple.

37.     In some larger Chapter 11 cases, debtors in possession have enough cashflow (despite their insolvency) to hire multiple attorneys, including conflicts counsel for themselves and other parties, not only when this is necessary to comply with applicable laws, but also in instances when this is not required but desirable to avoid even a mistaken "perception of a potential conflict." *Martin*, 817 F.2d at 182.

38.     One of the purposes of Subchapter V of the Bankruptcy Code is "to make the [Chapter 11] bankruptcy process more efficient and affordable to smaller, distressed debtors by . . . lowering administrative costs[.]" *In re Rockland Industries, Inc*., 2022 WL 451542 at *3 (Bankr.D.S.C. 2022). "This subchapter 'provides a streamed-down procedure that allows the self-employed to hold on to their small businesses.'" *In re Comedymx, LLC*, 647 B.R. 457, 462 (Bankr.D.Del. 2022) (quoting Douglas D. Baird, *The Elements of Bankruptcy* 20 (7th ed. 2022)).

39.     The Debtor does not mean to suggest that Subchapter V should excuse debtors in possession, their fiduciaries, or their attorneys from complying with ethical rules and other applicable laws.  Rather, the Debtor is proposing that the Court be mindful of this purpose of Subchapter V when considering whether the Firm should be disqualified from representing the Debtor in this Case because neither the Debtor nor its principal could afford an extra precaution, which (1) was not required by ethical rules or other laws, (2) was not necessary to avoid a conflict of interest, and (3) would have been undertaken only as an extra "suspenders-and-belt" countermeasure to prevent misunderstandings such as the one reflected in the U.S Trustee's Objection.

## BEST INTEREST OF THE ESTATE

40.     "This Court has broad discretion in determining whether to grant approval of the Application." *In re Bigler, LP*, 422 B.R. 638, 643 (*citing Arens v. Boughton* (*In re Prudhomme*). 43 F.3d 1000, 1003 (5th Cir. 1995)).  The Court needs to consider whether it would be in the best interest of the estate and its creditors for the Debtor, at this stage in the Case, to be required to find a new attorney.  The Debtor submits that, for at least three reasons, it would not.

41.     First, the Firm and Counsel have been working closely with the Debtor on its reorganization since last August.  During this time, Counsel has become well acquainted with the Debtor's business and has developed good working relationships with the Debtor's President and outside accountant.  Mr. Bauman makes this point emphatically in his declaration attached to the Application as Amended Exhibit G (the material components of which were drafted by Mr. Bauman—not Counsel).

42.     Second, Counsel is very familiar with this Case.  It is very possible that he has already performed most of the legal work necessary for the Debtor to reach a confirmed plan of reorganization and begin the post-confirmation stage of its reorganization.  In doing so, Counsel has contributed significant value to the estate.

43.     Third, it would be unduly costly to the estate—and prejudicial to its creditors—for a new attorney to invest the time that would be required to become familiar with the Debtor, its business and this Case.  Moreover, it might prove difficult for the Debtor to identify another attorney willing to accept the engagement.  As the Debtor has previously represented in this Case, the Firm has assumed significant financial risk to represent the Debtor in this Case.  Under the Court's January 24, 2024 Final Order Authorizing the Debtor to Make Limited Use of Cash Collateral, until all three of the adversary proceedings mentioned by the U.S. Trustee in his Objection have been resolved, neither the Firm nor a replacement attorney will be permitted to apply for fees or reimbursement of expenses. If the Debtor is unable to avoid any of three security interests challenged in these proceedings, there may be no funds available for payment of attorney's fees.

## EFFECTIVE DATE OF ENGAGEMENT AGREEMENT

44.     In its Application, the Debtor seeks the Court's authorization for the Debtor to engage the Firm pursuant to an engagement agreement (Application Exhibit B) that the Firm and the Debtor signed on January 3, 2024, but that expressly provides that it shall be "effective as of December 12, 2023[.]"  The Debtor and Counsel had previously discussed and agreed in principle to all of the material terms of the engagement agreement.[8]  The written expression of their agreement was not completed and executed until January 3, 2024 because Counsel's primary focus during the three weeks following the Petition Date (a period that included the Holiday Season) was on representing the Debtor in the Case.  When the parties did memorialize their agreement in writing, it expressly acknowledged their intent that the agreement be effective as of the Petition Date.

45.     In the last paragraph of his Objection, the U.S. Trustee states that "[i]n the event the Court determines that the Firm is not conflicted, the employment according to the January 3, 2024

---

[8] Many of these material terms, and most or all of the non-material terms, were identical to the terms of a separate engagement agreement the Firm had executed with the Debtor for prepetition services, a copy of which is attached to the Application as Exhibit A.

retainer agreement should be effective as of the date of the retainer, January 3, 2024, and not the petition date of December 12, 2023." The U.S. Trustee offers no authority in support of this position.

46.     Local Rule 2014-1(a) restricts "nunc pro tunc *applications* for appointment of professionals[.]" The same rule states that "[a]n application is considered timely if it is filed within thirty (30) days of the date of the filing of the bankruptcy petition . . ." "The purpose of requiring professionals to file applications (and obtain approval) early in the course of the professional's employment is to provide the court with a means of control over administrative expenses and an opportunity to review any conflicts, the professional's competency and the necessity of services to be performed[,]" 3 *Collier on Bankruptcy* ¶ 327.03 (footnotes omitted), all presumably before the professional has rendered too many services to the estate.

47.     The Debtor did not file a "nunc pro tunc application[ ]" to engage the Firm. The Application was timely filed, within 30 days after the Petition Date. If the Debtor had missed its deadline and asked that the filing be deemed nunc pro tunc to an earlier date, then it would have been required to demonstrate "extraordinary circumstances" for the court to consider the application. Local Rule 2014-1(a). That did not happen here.

48.     Local Rule 2014-1(a) says nothing about the timing of execution of engagement agreements. Neither this rule, nor Bankruptcy Rule 2014, nor Section 327 of the Bankruptcy Code, nor any other authority of which the Debtor is aware, prohibits a debtor in possession from executing an engagement agreement after the services have begun, expressly agreeing that the agreement shall be retroactively effective as the date when services began, and then filing a timely application for court approval of the engagement. If the application is timely, the timing of execution of the engagement agreement does not compromise any of the purposes referenced above.

49.     Indeed, it not even clear that a Debtor seeking to employ a professional in a bankruptcy case is required to have a written engagement agreement with the professional, as long as the Debtor's

application explains "the professional services to be rendered, any proposed arrangement for compensation," and the other content required by Bankruptcy Rule 2014(a).[9]

50.    Moreover, Section 328(a) authorizes a debtor in possession, with the court's approval, to employ "a professional person under section 327 of [the Bankruptcy Code] . . . on any reasonable terms and conditions of employment . . ."  It is common for parties to a contract who have reached an agreement in principle and are under time constraints to begin performing their respective obligations before the contract is reduced to writing, and later sign a written expression of their agreement that includes an express acknowledgement that it is retroactively effective as of an earlier date.  Such an acknowledgement is an entirely "reasonable term[ ] or condition[ ]."[10]  *Id.*

51.    Case law supports this.  As stated in an Illinois case,

> [U]ndoubtedly a contract may have retrospective operation.
>
> * * *
>
> It is a common occurrence in connection with deeds, leases and other contracts that . . . they, in point of commencement, relate back or commence in the future.  Such relation back or forward contravenes no principle of law and is determined by the intent of the parties as deducted from the instrument itself.

*Janowiak v. Tiesi*, 932 N.E.2d 569, 577 (Ill.App. 2010) (internal citations and quotation marks omitted).  Relying on authorities from multiple jurisdictions, the Supreme Court of Georgia has observed,

> [T]he effective date of a contract is not the date of execution where the contract expressly states that its terms are to take effect at an earlier date.  It is elemental that contracting parties may agree to give retroactive effect to their contracts as they see fit.  And, it is

---

[9] In the present Case, the Debtor filed an amended application authorizing it to employ an accountant, effective as of the Petition Date, which attaches no engagement agreement.  *See* Docket No. 90.  The U.S. Trustee did not object to that application.

[10] Section 328(a) goes so far as to empower a court to "allow compensation different from the compensation provided under [the] terms and conditions [of an engagement agreement] after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  If the Bankruptcy Code affords the Court that much discretion, it surely allows the Court to approve an engagement agreement with a retroactive effective date.

> fundamental that where parties to an agreement expressly provide
> that a written contract be entered into "as of" an earlier date than
> that on which it was executed, the agreement is retroactively "as of"
> the earlier date and the parties are bound thereby.

*American Cyanamid Co. v. Ring*, 286 S.E.2d 1, 3 (Ga. 1982) (citing, *inter alia*, *Mutual Life Ins. Co,*

*of N.Y. v. Hurni*, 263 U.S. 167 (1923), 17A C.J.S. Contracts § 359, p. 361; 17 Am.Jur.2d, Contracts

§ 69, p. 408.) (internal quotation marks and interpolations, and other internal citations omitted).

52.     In the present Case, no third party could possibly be prejudiced by the timing of

execution of the engagement agreement.  Regardless of the date on which it was signed, the agreement

provides that the Firm shall be compensated for services rendered post-petition, and expressly

provides that it is subject to this Court's approval of the present Application.  Review of the

Application is occurring no later than it would if the agreement were signed prepetition or on the

Petition Date.  The terms of the agreement are no less subject to scrutiny.  If the engagement is

approved, the Firm's fees between the Petition Date and January 3, 2024 will be no less subject to

scrutiny within the fee application process.

53.     As the docket of this Case shows, the lack of a signed engagement agreement did not

prevent the Firm from diligently representing the Debtor between the Petition Date and January 3, a

very deadline-intensive stage in this Case.  In fact, it was precisely because of this diligence, and the

enormous amount of work the Firm performed during that period (which coincided with the Holiday

Season) that Counsel was delayed in finalizing the engagement agreement.  If the Court does not

allow the Firm's engagement to be effective until January 3, 2024, this could cost the Firm a

significant amount of fees and expense reimbursements, ironically because Counsel was more

focused on rendering timely service to the Debtor and its estate during this period than on protecting

his own interest.

## CONCLUSION

54.    For the foregoing reasons and those stated in its Application, the Debtor respectfully requests that the Court overrule the U.S. Trustee's Objection and enter an order authorizing the Debtor to engage the Firm effective as of the Petition Date.

Respectfully submitted,

Dated: January 30, 2024

**REPMGMT INC. CHARTERED**,
d/b/a Fireside Campaigns,
Debtor and Debtor in Possession

*/s/ Robert W. Lannan*

by: _____
       Robert W. Lannan (D.D.C. Bar. No. 454965)
       Lannan Legal PLLC
       1717 K Street, N.W., Suite 900
       Washington, D.C. 20006
       Tel.: (202) 223-8901
       Fax: (202) 747-7760
       Email: robert.lannan@lannanlegal.com

*Proposed counsel to the Debtor*
*and Debtor in Possession*