Robert W. Lannan (D.D.C. Bar No. 454965)
Lannan Legal PLLC
Washington, D.C. 20006
Telephone: (202) 223-8901
e-mail: robert.lannan@lannanlegal.com

*Counsel to the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

In re:

**REPMGMT INC. CHARTERED**,                            Case No. 23-00375
d/b/a Fireside Campaigns,

                                                        Chapter 11

    Debtor


## RESPONSE OF LANNAN LEGAL PLLC TO OBJECTION OF THE ACTING UNITED STATES TRUSTEE TO THE APPLICATION OF LANNAN LEGAL PLLC FOR INTERIM COMPENSATION OF FEES AND EXPENSES

Lannan Legal PLLC (the "**Firm**"), by and through its undersigned principal Robert W. Lannan ("**Counsel**"), respectfully submits this response (the "**Response**") to the objection (the "**Objection**") of Gerald R. Vetter, Acting United States Trustee for Region 4 (the "**U.S. Trustee**"), to the Firm's application (the "**Application**"), pursuant to Sections 330(a), 331 and 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2016-1 of the Local Rules of the United States Bankruptcy Court for the District of Columbia (the "**Local Rules**"), for interim compensation of fees and expenses incurred by the Firm as bankruptcy counsel to RepMGMT Inc. Chartered, d/b/a Fireside Campaigns (the "**Debtor**") in the above-captioned case (this "**Case**").  As its Response, the Firm respectfully states as follows:

## I.    <u>INTRODUCTION</u>

1.    The Objection raises procedural and substantive objections to the Application.  To respond to the procedural objections, the Firm has filed an amended version of the Application (Docket No 192) that corrects all or nearly all of the procedural deficiencies noted in the Objection.

The amended Application is substantively identical to the originally-filed version of the Application, with only two exceptions, each reducing the amount of fees the Firm seeks.  First, the Firm eliminated three time entries that it discovered to have been mistakenly billed to the wrong client and matter.  Second, the firm "non-charged" a $200 time entry for work the Firm performed for the Debtor but for which it is not seeking compensation for reasons addressed below.  Concurrently with its amended Application, the Firm filed a related motion (Docket No. 191) (the "**Motion**"), in which the Firm requests that the Court consider the amended Application in lieu of the original version, on shortened and limited notice.

2.      Because the substance of the amended Application is, with the minor exceptions noted above, identical to that of the original Application, the Firm assumes that the U.S. Trustee's substantive objections apply equally to the amended version.  For the same reason, the Firm believes it should not be necessary to re-serve the amended Application on all parties in interest with an additional 21-day notice period.  The Firm therefore requests that the Court consider the amended Application to be part of the Firm's overall response to the U.S. Trustee's Objection, and this Response brief (which mostly addresses the U.S. Trustee's substantive concerns) to be the remainder of that overall response.

3.      Section II of this Response briefly addresses the U.S. Trustee's procedural objections, and how the Firm has responded to them in the amended Application.  Section III (the bulk of this Response) addresses the U.S Trustee's substantive objections.  Section IV addresses notice of this Response and Section V repeats the prayer for relief in the amended Application.

## II.      <u>PROCEDURAL OBJECTIONS</u>

4.      The U.S. Trustee's Objection correctly identifies a few procedural deficiencies in the Application.  The Firm has corrected most or all of these deficiencies in the amended Application.  They therefore should not prevent the Court from reviewing and ruling on the Application.  Neither

should they have any impact on the substance of the Court's ruling.

## A. <u>Timing of Application</u>

5.      Section 331 of the Bankruptcy Code presumptively allows a professional to apply for interim compensation "not more than once every 120 days after the order for relief in a case[.]"  The Firm overlooked this 120-day requirement and filed its Application twenty-two days early.  However, Section 331 also allows a professional to apply "more often if the court permits."  Had the Firm not overlooked the 120-day requirement, it would have added a paragraph to its Application requesting the Court to exercise its discretion under Section 331 to allow the Firm to submit the Application earlier.

6.      The amended Application was filed within 120 days after the Petition Date.  As discussed above and in the Motion, because it is nearly identical in substance to the original Application, nothing would be gained from serving the amended Application on all parties in interest in this Case, who have already had over 21 days to review the original version of the Application.

7.      Review of the amended version of the Application is *de facto* review of the original Application, which was filed early.  Therefore, in its Motion, the Firm has requested retroactive leave under Section 331 of the Bankruptcy Code to have filed the original version early.

## B. <u>Redacted Time Entries</u>

8.      The U.S. Trustee also takes issue with the amount of text redacted from the time entries included in the Application's exhibits.  Most or all of the redacted content documents privileged communications between the Firm and the Debtor, and was redacted to preserve that privilege.  As noted in the Motion and the amended Application, the Firm has provided to the U.S. Trustee, and is availing to the Court for *in camera* review, a spreadsheet of unredacted time entries.  The Firm does so with the understanding that it is reserving the attorney-client privilege both with respect to the individual communications redacted earlier, and generally.

### C. <u>Absence of a Case Status Report</u>

9.      The Objection also complains that "[t]he Application does not go into the status of the case and what is left to be done."  Objection ¶ 22.  The amended Application includes a section reporting on the status of the case, which includes all of the content required by Section (b)(2) of the United States Trustees' Guidelines Relating to the Bankruptcy Reform Act of 1994, 28 C.F.R. Part 58 (the "**U.S. Trustees' Guidelines**").

### D. <u>Absence of a Summary Sheet</u>

10.      The Objection correctly notes that the Application did not include a summary sheet. The amended Application includes a summary sheet compliant with Section (b)(3) of the U.S. Trustees' Guidelines.

### C. <u>Absence of Project Categories</u>

11.      The U.S. Trustee's Objection notes that the time entries attached to the Application did "not utilize project billing format to facilitate an effective review of the application."  Objection ¶ 22.  Each of the time entries in Exhibit A-1 of the amended Application includes one of the project categories identified in Exhibit A of the U.S Trustees' Guidelines.

### D. <u>Absence of a Summary of Expenses</u>

12.      Finally, the U.S. Trustee complains that the Application did not include "a detailed itemization or summary of the expenses incurred."  Objection ¶ 23.  The statements attached to the original Application as Group Exhibit A include lists of the expenses, including for each expense its date, source and amount.  The Objection refers to 58 pages of receipts that validate the lists, but not the lists themselves.  It is not clear that the Bankruptcy Rules, the Local Rules or the U.S. Trustees' Guidelines require more documentation of expenses than the Firm included in its Application.

13.      Nevertheless, to assuage any doubt, the Firm has attached, as Exhibit A-2 of the amended Application, a spreadsheet that itemizes, categorizes and summarizes the expenses included

in the Application, tying most of the expenses to corresponding pleadings in the Case.

### III.      SUBSTANTIVE OBJECTIONS

14.      The U.S. Trustee also raises a number of substantive objections, which the Firm addresses in this section of the Response.

15.      These substantive objections focus on the Firm's fees, and not its requests for expense reimbursements.  The expenses in the Application consist mostly of the costs of copying and mailing service of pleadings to creditors.  These have been high because the Debtor has a large number of creditors for a small business.  The Firm has not marked up any of these costs.  Because they are not addressed in the Objection, the Firm will assume they are not of concern to the U.S. Trustee.  The remainder of this section of the Response will address the Firm's fees.

16.      The substantive concerns raised in the U.S. Trustee's Objection roughly fall into two categories: (1) specific concerns and (2) a general concern over the amount of fees sought.  The Firm will address each of these categories in turn.   It will then address generally the lodestar process employed in this district as applied to the Application, and a few factors particularly relevant to this Case that the Court should consider.

### A.  The U.S. Trustee's Specific Concerns

#### 1.  Paralegal Time Entries

17.      The U.S. Trustee complains that while the Firm relied on the services of a paralegal in this Case, there  are only three time entries for her services, and it is therefore "unclear whether the paralegal further assisted in connection with this case."  Objection ¶ 24.

18.      She did.  To begin, in addition to performing paralegal services, Fernanda Verruck works for the Firm as a legal assistant.  She therefore performed numerous administrative tasks for which the Firm is not seeking compensation.  In addition to those, she probably performed some paralegal tasks in this Case for which she forgot to record her time.  The Firm is not seeking

compensation for those.  They are a windfall to the estate, and not grounds for objection.

19.      The U.S. Trustee may be concerned that Counsel performed tasks that he could have delegated to Ms. Verruck.  If Counsel did, these would appear in time entries included in the Application.  However, the U.S. Trustee has not identified any particular task or time entry in his Objection, in relation to this concern or any other.

## 2.   Performance of Administrative Tasks

20.      The Objection includes the following statement: "Administrative tasks were and should not have been billed at the full attorney rate."  *Id*. at 25.  This is either an overstatement or a blatant misstatement.  If the term "administrative" is synonymous with "secretarial," "clerical" or "ministerial"—as distinguished from tasks that could be performed  by a paralegal—then the Firm is confident that it has not billed any "administrative" tasks at *any* rate.[1]

21.      To be sure, several of Counsel's time entries state that he "caused" a pleading to be filed and served.  These entries usually, if not always, follow statements within the same time entries that Counsel finished drafting a pleading or obtaining the Debtor's approval of a pleading.   Counsel's practice of noting that he "caused" a pleading to be filed and served is largely to document the point in time when, within a progression of time entries related to development of that pleading, it was finally filed and served.  Even if Counsel filed and served the pleading himself (which was usually the case), he did so off the clock and did not record more time than would have been required for him to instruct someone else to do so.

---

[1] This is not to say that Counsel has not performed administrative tasks in this Case.  Because Ms. Verruck works virtually from her home in Argentina, it has fallen to Counsel to do all of the copying and mailing.  Counsel has practically gotten to know employees of his U.S. Post Office by name.  The copy center employees of the Staples nearest to Counsel's office have grown tired of him repeatedly asking them to refill their machines with paper.  If modern envelopes were not self-adhesive and still had to be licked to be sealed, Counsel would long since have been poisoned to death by the task. **However, Counsel has never billed a minute of these or other administrative tasks in this Case.**

**B.**  **The U.S. Trustee's General Concern over Amount of Fees Sought**

22.  The U.S. Trustee's Objection appears to be primarily motivated by the amount of fees the Firm seeks in relation to the size of this Case.

23.  The fees of which the Firm seeks approval in the application total **$114,230**.  This is admittedly a large sum for representation of a small business debtor "a mere three months" into a Subchapter V case.  Objection p. 1.

24.  The "size of the estate" is indeed a factor relevant to assessing a professional's fee application.  *In re Hopkins Northwest Fund LLC*, 567 B.R. 590, 596 (Bankr.D.Idaho 2017).  However, it "is only one factor[.]"  *In re Chary*, 201 B.R. 783, 788 (Bankr.W.D.Tenn. 1996).  Faced with a similar objection by a United States Trustee to an employment application in another small case, the U.S. Bankruptcy Court for the District of New Jersey reasoned, "Regardless of the size of the case, the bottom line consideration should be whether the terms of retention are fair; both to the professional whose retention is sought, as well as to the debtor and its creditors who must bear the expense."  *In re Truong*, 259 B.R. 264, 267 (2001).  The same reasoning can be applied to consideration of an application for fees incurred applying terms of employment already approved.

25.  The present Case has presented complexities that make the amount of fees the Firm seeks in the Application both fair and reasonable.  These complexities of this case have fallen into two categories: (1) those not caused by the U.S. Trustee and (2) those caused by the U.S. Trustee himself.

1.  Complexities of Case Not Caused by the U.S. Trustee

26.  Even if the U.S. Trustee had never filed an objection in this Case, the fees in this Application would be unusually high for a case of this size because of other challenges beyond the Firm's control, the Firm would have been negligent to ignore.  The following are a few examples:

*a.  COBRA Motion*

27.     The first of these challenges surfaced the day after the Petition Date.  It was on that date that Counsel learned that eighteen of the Debtor's former employees would lose COBRA health insurance (amid the Holiday Season), causing the estate significant potential liability, if the Debtor were not allowed to make a premium payment of just over $14,000 within the following two weeks. This required the Firm to draft an emergency motion.  (The Court approved that motion over the U.S. Trustee's objection.  *See* Docket No. 50.)  Drafting and presenting that Motion took time.[2]

*b.  Amendments to Schedules and SOFA*

28.     The U.S. Trustee has expressed concern over the number of times the Debtor has amended its bankruptcy schedules and Statement of Financial Affairs.  *See, e.g.*, Objection of the Acting United States Trustee to the Debtor's Application to Employ Lannan Legal PLLC as Bankruptcy Counsel, Docket No. 123 (the "**Employment Objection**") ¶ 6.  The U.S. Trustee appears to assume that this has been because of inefficiency of the Firm or Counsel.  It has not.  The Debtor has acknowledged that it has been necessary for the Firm to amend filings when related information did not become available to Counsel until after the earlier filings were made.  Declaration of Bradley M. Bauman, Docket No. 93 ¶ 6.  On several occasions, the Firm has learned late about an asset of the estate, an executory contract or (usually) a creditor.  It would have been inappropriate for the Firm to have withheld this information form the record of the Case.  The Firm has duly responded by amending the Debtors schedules and SOFA as needed, and this has taken time.

*c.  Unauthorized Withdrawal of Cash Collateral*

29.     After the Court had entered a very strict interim cash collateral order (Docket No. 51), the Debtor's bank inadvertently allowed unauthorized withdrawals of cash collateral from the

---

[2] The Firm is not seeking reimbursement of the cost of serving the Debtor's secured lenders 20 largest creditors copies of the Court's order by FedEx, as requested by the U.S. Trustee and required by the Court.

Debtor's account.   Given the strict limits within the cash collateral order, it   would have been unprofessional not to disclose this incident to the Court.  The Firm therefore did so.  This took time. Docket No. 83.

### d.  Interactions with a Union

30.     Most small business debtors are not parties to collective bargaining agreements.  The Debtor in this Case is.  The Debtor's former employees hold the bulk of the priority unsecured claims in this Case.  Most of these employees continue to be represented by the Campaign Workers Guild under a collective bargaining agreement with the Debtor.

31.     The Debtor regards this as a valuable opportunity, because it wishes to gain the union's support of a Plan of Reorganization the Debtor has filed in this Case, through which the Debtor seeks to pay 100% of its former employees' claims.  *See* Docket No. 181.  Moreover, working with organized labor organizations is important to the Debtor, whose sole client at this time is the AFL-CIO.

32.     From time to time while this Case has been pending, counsel has interacted with two attorneys representing the Campaign Workers Guild.  This has taken time.

### e.  Adversary Proceedings

33.     The fees that the Firm seeks to recover in the present Application include $16,650 for the Firm's representation of the Debtor in three avoidance actions.  In all three, the Firm enabled the Debtor to successfully avoid security interests it had conveyed to subprime lenders.  In one, the Firm also enabled the Debtor to recover $17,500 of preference payments.  The Firm believes the Court should consider these fees apart from fees the Firm incurred representing the Debtor in the main Chapter 11 Case.  The Firm's recovery of preference payments more than pays for these fees.  More importantly, the three adversary proceedings enabled the Debtor to avoid all of the security interests

in its assets previously held by non-insider creditors.[3]

2.   Complexities of Case Caused by the U.S. Trustee

34.    Ironically, much of the complexity that has added to the fees that the U.S. Trustee protests in his Objection is due to heightened scrutiny in this case by the U.S. Trustee himself.  Much of this scrutiny has been misplaced, as shown by decisions of the Court that, to date, have largely overruled his objections.

<em>a.  Employment of Special Counsel</em>

35.    On January 25, 2024, the U.S. Trustee objected to the Debtor's employment of the Firm, largely because of Counsel's involvement in drafting a prepetition credit facility between the Debtor as borrower, and its sole shareholder Bradley Bauman and his wife Autumn Campbell as lender.  *See* Employment Objection.  In the Employment Objection, the U.S. Trustee stated that "independent counsel [was] needed to evaluate" a potential claim by the Debtor against Mr. Bauman and Ms. Campbell to avoid a security interest that the Debtor has transferred to them within this credit facility.  *Id.* ¶ 23.  In a response filed on January 30, 2024 (Docket No. 126), and at a status hearing on February 1, 2024 (at which the U.S. Trustee's counsel was present), Counsel represented that the Debtor would be willing, as a compromise, to agree to engagement of another attorney to assess whether an avoidance action against Mr. Bauman and Ms. Campbell were appropriate, and to pursue one if that attorney believed it were.  *See* Docket No. 126 ¶ 29.

36.    This compromise was not sufficient for the U.S. Trustee, who persisted with his Employment Objection.  In an order entered on February 16, 2024, the Court allowed the Debtor to engage the Firm with the condition that the Debtor engage special counsel to review the credit facility and any other prepetition transactions in which the Firm had represented the Debtor.  *See* Docket No.

---

[3] The Debtor's two insider creditors, Mr. Bauman and Ms. Campbell, have waived their right to adequate protection of their security interests to support the Debtor's reorganization in this Case.

153.

37.    This required the Firm to identify special counsel, negotiate an engagement agreement, and draft an application (including supporting documents) for the Debtor to engage special counsel. All of this took time.

38.    On March 19, 2024, the Court entered an order authorizing the Debtor to engage Special Counsel to "review all prepetition transactions in which [Counsel] or [the Firm] represented the Debtor (the 'Transactions') to determine whether it is in the best interest of the estate for the Debtor to pursue actions for avoidance and recovery against any non-debtor parties arising out of any of the Transactions."  Docket No. 183 ¶ 4.  The order instructs Special Counsel to file a report with the Court expressing his conclusion in this issue, *Id.* and, "[i]f [he] believes it is in the best interest of the estate to pursue any avoidance and recover action against any non-debtor party to any of the transactions it has reviewed," to "pursue such action on behalf of the Debtor."  *Id*. ¶ 6.

39.    If Special Counsel, on the terms of engagement approved by the Court under the above order, files any avoidance and recovery action in this Case against any non-debtor party to any prepetition transaction in which Counsel or the Firm represented the Debtor, then the Firm will agree to a reduction, from any amount of fees approved by the Court in response to the present Application, with the total amount of that reduction being equal to (a) the amount of fees and expenses incurred by the Firm identifying Special Counsel, negotiating an engagement agreement with Special Counsel, applying for the Debtor to engage Special Counsel (including all copying and postage expenses incurred in serving that application on the matrix), and obtaining approval of that application, plus (b) $9,000 to reimburse the estate Special Counsel's fee for reviewing the Transactions.  Otherwise, the Firm should not be penalized for this complexity in the Case.

       *b.  Response to Objection to Engagement of the Firm*

40.    As noted above, the U.S. Trustee did not accept the Debtor's proposed compromise in

response to his Employment Objection that the Debtor be allowed to employ the Firm subject to the above review of Transactions by Special Counsel.  The U.S. Trustee persisted in his objection.  The Employment Objection was centered on an assumption that the Firm had performed legal services "on behalf of the Debtor's sole owner and his wife," that this work "benefited the principal and his wife, not the debtor," and that this presented a "direct conflict of interest."  *Id.* ¶ 23.  It noted that Mr. Bauman and Ms. Campbell were not represented by their own attorney. *Id.* ¶ 12.  It noted in particular the Firm had placed its own address as the return address on a UCC-1 financing statement that perfected Mr. Bauman and Ms. Campbell's security interest in the Debtor's assets.  *Id.* ¶ 21.  It faulted the Firm for supporting the Debtor's decision not to seek to avoid this security interest.  *Id.* ¶¶ 15 and 16.  It took the Firm to task for allowing portions of its fees for prepetition services to the Debtor to be financed by Mr. Bauman and Ms. Campbell.  *Id.* ¶ 9.  Lastly, for good measure and without citing any authority, the Employment Objection contended that if the Court were inclined to allow the Debtor to engage the Firm, the engagement should not be effective until the date of execution of the engagement agreement, regardless of its provision expressly providing that it be retroactively effective as of the Petition Date.  *Id.* ¶ 26.  Underlying all of these points, the U.S. Trustee urged the Court to adopt a strict standard that, if applied on its face without actually reading the case law cited to support it, would disqualify a professional "who in the slightest degree might have some relationship that that would color [an] independent and impartial attitude . . ."  *Id.* ¶ 24.

41.     The Firm was forced to respond to all of these arguments.  One of the points made by the U.S. Trustee in his objection was that "[p]rofessionals seeking employment bear the burden of demonstrating that they meet the qualifications of [11 U.S.C.] § 327."  To sustain that burden and overcome all of the above arguments, Counsel had to expend much more time and effort than it had taken the U.S. Trustee to make them.

42.     At a February 14, 2024 hearing on the Debtor's application to employ the Firm, the

Court largely overruled the U.S. Trustee's Employment Objection and allowed the Debtor to employ the Firm, subject to the compromise that the Debtor had earlier proposed. However, the Court reserved the issue of the effective date of the Firm's employment. As the same hearing, counsel to the U.S. Trustee argued for the first time that to allow such retroactive application would be "clearly a violation of the Supreme Court's decision in" *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. ___, 140 S.Ct. 696 (2020), and that the issue of the retroactive effective date "f[ell] directly under that" precedent. U.S. Bankruptcy Court for the District of Columbia, *In re RepMGMT, Inc. Chartered*, Case No. 23-00375-ELG, Transcript of (1) Status Hearing [and] (2) [Hearing on] Application to Employ Lannan Legal PLLC as Bankruptcy Counsel before Hon. Elizabeth L. Gunn, U.S. Bankruptcy Judge, Docket No. 190, p.p. 20-21.[4] This was the first time the U.S. Trustee mentioned the *Acevedo* case, as well as a second authority relied on by his counsel in support of the same argument: D.C. Rule of Professional Conduct 1.5(b). *Id*. p. 20.

43.    The Firm then had to respond to those arguments.[5] Counsel therefore went back to the library, bought a new toner cartridge[6] to print out the next batch of cases he emailed to himself from WESTLAW, and went to work drafting a supplementary brief (and a motion for leave to file it). This took time—again, much more time than it had taken for the U.S. Trustee's counsel to make the arguments to which Counsel was forced to respond. This time, the Court overruled the U.S. Trustee completely, entering an order that allowed the Firm's employment to be retroactive as of the Petition

---

[4] The Debtor ordered a transcript of this hearing, which was automatically filed in the Case and will appear at Docket No. 190. As of the date of this Response, the transcript is still subject to review by the parties for any Request(s) for Redaction, and will not be of public record until the end of a restriction period. Respecting these limitations, the Firm will not attach a full or partial copy of the transcript here, but will provide one to the U.S. Trustee, the Subchapter V Trustee or Chambers upon request.

[5] The Court suggested at the February 14, 2024 hearing that even if the Firm's engagement were not allowed retroactive to the Petition Date, there might be other authority under which the Firm could be compensated for a considerable amount of work it did between the Petition Date and January 3, 2024. *Id*. p. 31. However, Counsel knew from his earlier research that counterarguments could be made against that possibility, and Counsel had a reasonable expectation that the U.S. Trustee would oppose it.

[6] No, the Application does not seek reimbursement of the cost of the toner cartridge.

Date.  Docket No. 168.  The order makes no mention of *Acevedo*.  *Id*.

44.     The Firm's work on its first brief in opposition to the U.S. Trustee's objection to its employment was not entirely in the Firm's self-interest.  As the Firm noted in that brief, due to the financial risks involved in this Case, it would have been difficult for the Debtor to find a new bankruptcy attorney.  Even if it did, it would have been costly for that attorney to get up to speed on the Case.  However, the Firm recognized that much of its work on this brief was in its self-interest.  Therefore, in the present Application, the Firm is only seeking compensation for half of the time it spent researching and drafting that brief: $15,200.  This figure is reasonable given the amount of fees and expenses the Firm had at risk by the time of the February 14, 2024 hearing on the employment application and the U.S. Trustee's objection (about $82,000).  More importantly, the additional cost to the estate would have been greater than $15,200 if the U.S. Trustee's objection were sustained and the Debtor forced to identify a new bankruptcy attorney, offer favorable terms for compensation and educate the new attorney on the Case and the Debtor's business (or, worse, seek dismissal or conversion of the Case if the Debtor were unable to find a new attorney willing to accept the engagement).

45.     With regard to the Firm's supplementary brief, the relative interests of the Firm and the estate were different.  It would have been windfall to the estate if the Firm had lost that argument and been otherwise unable to recover fees and expense reimbursements for the work it did between the Petition Date and January 3, 2024, which totaled about $26,000.  The Firm is therefore not seeking any compensation in the present Application for the time it spent researching and writing the second brief.[7]  Without having researched the issue, the Firm suspects that it does have a right to seek compensation for its work on the second brief.  The Firm requests that the Court be mindful of this

---

[7] The Firm inadvertently failed to "non-charge" an entry of four tenths of an hour ($200) for its initial review of the *Acevedo* case after the February 14, 2024 hearing.  The Firm has therefore reduced the amount of fees for which it seeks approval in the Application by an additional $200, as noted above.

concession to the estate when reviewing the Application as a whole.

46.    The above examples are only two (potentially three, depending on Special Counsel's decision) in which the U.S. Trustee has imposed an unwarranted level of scrutiny that has been an administrative burden to the estate, but has resulted in little-to-no benefit to the estate. The present Objection is a third example. Was the estate truly prejudiced by Counsel's oversight that it had not yet been 120 days (but only 98) from the Petition Date when he filed the Application? *See* Objection ¶ 12(a). Did the lists of expenses included in Group Exhibit A of the original Application truly lack enough "detailed itemization or summary" to cause prejudice to the estate? *Id*. ¶ 23. In its amended Application, the Firm has responded to these and other procedural objections made by the U.S. Trustee. This has also taken time. Has it truly benefited the estate?

47.    If the U.S. Trustee is truly concerned that the Firm's services "result[ ] in a benefit to the estate and its creditors," Objection p. 1, and that the Debtor's reorganization proceed in a "cost effective manner," *Id*. ¶ 27, then the Firm respectfully proposes that he be more willing to give the Debtor and the Firm the benefit of the doubt, on both substantive and procedural levels.

3.    Fees After Netting Out Those Incurred Performing Certain Tasks Addressed Above

48.    If one nets out the fees accrued by the Firm only in response to two of the complexities above: (1) the three adversary proceedings, and (2) responding to the U.S. Trustee's largely overruled Employment Objection (including fees incurred identifying, negotiating an engagement agreement with, and applying for employment of special counsel), then the amount of fees the Firm seeks to recover in this Application is $76,280. If the Firm were now applying to recover $76,280 in fees, would the U.S. Trustee object that this amount is "excessive and should be disallowed"? Objection ¶ 30.

49.    Possibly. In response to that hypothetical objection, the Firm submits that the Court should consider the other complexities noted above, which have made representation of the Debtor

more time-consuming than the Firm had expected.  Meanwhile, for the reasons discussed above, the Firm maintains that it should be allowed to recover the fees it incurred pursuing three highly successful avoidance actions and responding to the U.S. Trustee's largely overruled Employment Objection.

### C. The Lodestar and Other Relevant Factors

#### 1. The U.S. Trustee's Objection

50.     The U.S. Trustee's Objection correctly notes that a party requesting approval of fees has the burden of proving that it is entitled to those fees.  Objection ¶ 17.  It also recites the three-part process announced by this Court in *In re Taiwo*, 2021 WL 850533, to determine a lodestar for analyzing attorneys' fees. *Id*. ¶ 18 (quoting *Taiwo* at *4).  This follows a summary by the U.S. Trustee of factors listed in Section 330(a)(3) for determining whether attorneys' fees are reasonable, Objection ¶ 14, and precedes quotations of other case law identifying factors a court should consider within this process.  *Id*. ¶¶ 19-21.  However, the U.S. Trustee does nothing to apply any of the authorities he cites to the 596 time entries in the Application that describe the Firm's services.  The Objection leaps to a conclusion that the Firm "has not met its burden" imposed by all of these laws without applying any of them to a single time entry.  *Id*. ¶ 22.

51.     "In determining the lodestar, the fee applicant has the burden or properly documenting the hours and hourly rates involved and producing evidence of both.  The burden of going forward then shifts to an opposing party if it wishes to dispute the lodestar.  It must submit evidence challenging the accuracy or reasonableness of any item in the application." *In re Hunt's Health Care*, 161 B.R. 971, 976 (Bankr.N.D.Ind. 1993) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and *Blum v Stenson*, 465 U.S. 886, 892 n. 5 (1984).  "Under [11 U.S.C.] § 330, an attorney's fees are presumed valid unless *particular parts* are denied for *particular reasons*."  *In re Val W. Poterek & Sons, Inc*., 169 B.R.  896 (Bankr.N.D.Ill. 1994) (emphasis added).

52.     The Application's 596 time entries plainly "document[ ] the hours" spent by Counsel and his paralegal performing services for the estate. *Hunt's Health Care* at 976. They also plainly apply to this time the "hourly rates" previously approved by the Court. *Id*. The Application "produc[es] evidence" of the services rendered, *Id*., in the form of descriptions recorded contemporaneously with those services as required by Section (b)(4)(v) of the U.S. Trustees' Guidelines. The Firm has met its *prima facie* burden. If the U.S. Trustee "wishes to dispute the lodestar" as applied to any "item in the [A]pplication," he now bears the burden of "submit[ting] evidence challenging the accuracy or reasonableness of [that] item"—i.e. that time entry. *Id*. His Objection does not even attempt to do so with respect to any time entry.

53.     The Firm is not here required, and will not attempt, to analyze its 596 time entries to provide further justification for its entitlement to compensation. Neither will the Firm attempt to apply all of the numerous factors identified in Section 330 of the Bankruptcy Code and extensive case law on bankruptcy fee applications to the Application as a whole. However, the Firm does wish to highlight *some* of the factors that are relevant to the Application.

## 2. The Lodestar

54.     The starting point for this discussion is the lodestar analysis adopted by this Court in *In re Taiwo*, 2021 WL 850533 at *4 (Bankr.D.D.C. 2021). This analysis starts with "the reasonably hourly rate for each person for whom compensation is requested[.]" *Id*. The U.S. Trustee has never objected, either in the Employment Objection or the present Objection, to the hourly rate of Counsel or Ms. Verruck. Those rates were requested in Employment Application, and implicitly approved by the Court in its February 16, 2024 order approving the Application. "[W]here [a] Bankruptcy Court has previously approved the terms of compensation of a professional, it cannot alter those terms unless it finds the original terms improvident in light of developments not capable of being anticipated originally." *In re Circle K Corp.*, 165 B.R. 653, 656 (Bankr.D.Ariz. 1994).

55.     In any event, the rates in the Application are market, and consistent with "prevailing rate[s] based generally on the geographical area, the nature of the service and the experience of the attorney[ ]" and paralegal providing the services.  *In re Delaware Valley Truck Lift, Inc*., 640 B.R. 342, 373 (Bankr.E.D.Pa. 2022) (internal citations omitted).  In *Brackett v. Mayorkas*, Civil Case No. 17-988-JEB, the U.S. District Court for the District of Columbia endorsed use of a "Fitzpatrick Matrix," developed by Professor Brian Fitzpatrick for the U.S. Attorney's Office for the District of Columbia, to gauge prevailing hourly rates in the District of Columbia market for awards of attorneys' fees.  *See Id*., Memorandum Opinion dated August 9, 2023, Docket No. 114.  Under that matrix, the prevailing rate for 2023 for an attorney who has practiced law as long as Counsel has is $791.  *See* Fitzpatrick Matrix, available at < https://www.justice.gov/usao-dc/civil-division>.  Even if Counsel's years of experience are limited to those during which he primarily practiced bankruptcy law, the prevailing rate for 2023 falls well above $500 per hour.  *Id*.

56.     Although it differs vastly from the present Case in size, another interesting point of reference is a "mega-case" filed this year in the U.S. District Court for the Eastern District of Virginia, *In re Envira, Inc*., Case No 24-10453-BFK.  That district is within the jurisdiction of the same U.S. Trustee.  In *Envira*, the debtor has filed an application to engage a law firm under terms that would compensate the firm for services rendered by its *most junior associates* at a rate of $850 per hour. *See Id.* Docket No. 183 ¶ 14.  The rate proposed for its *most junior paralegals* is $570 per hour.  *Id*. The deadline for objection to this application was April 10, 2024.  The U.S. Trustee has filed an objection.  *Id*. Docket No. 273.  However, the objection is not based on the proposed rates, and makes no mention of those.

57.     To be sure, the present Case is the opposite of a "mega-case."  Moreover, the Firm acknowledges that it has nowhere near the resources of the law firm that Envira, Inc. has applied to employ as its bankruptcy counsel.  However, the Firm does submit that if it is market in the

Washington, D.C. metropolitan area and acceptable to the U.S. Trustee to employ, in *any* case, *any* attorney admitted to the Bar as recently as six months ago at a rate of $850 per hour, or *any* newly-minted paralegal at a rate of $570 per hour, then it is reasonable for the Firm to seek compensation for Counsel's services in this Case at a rate of $500 per hour.

58.     The Firm also submits that $200 per hour is a reasonable rate for paralegal services. The Application discusses Ms. Verruck's education and experience, which need not be repeated here.

59.     The two remaining factors in the lodestar analysis are "the number of hours reasonably expended" by each timekeeper and "any adjustments warranted[.]" *Taiwo* at *4.   In the present Application, the number of hours expended for each task is reflected in the Firm's timesheets, which cannot be practicably summarized here.  If any "adjustments" are "warranted," this must be based on other factors included in Section 330 of the Bankruptcy Code and case law on fee applications.  The Firm has already addressed one of these factors—the complexity of this Case—above.  The reminder of this section addresses others.

### 3. Undesirability of Case

60.     The "undesirability of [a] case" is a factor that several courts have considered to be relevant to attorneys' fee applications. *See, e.g. In re Spear*, 636 B.R. 765, 771 (Bankr.S.D.Ohio 2022) (citing, among other cases, *In re Boddy*, 950 F.2d 334, 338 (6th Cir. 1991) and *Harman, v. Robertson*, 772 F.2d 1150, 1152 n. 1 (4th Cir 1985)).  The present Case was "undesirable" for a bankruptcy attorney to accept because of significant risk of recovery of fees.  On the Petition Date, the Debtor had a negative bank account balance.  (The Firm had to advance its filing fee.)  All of its cash was encumbered by security interests of multiple secured creditors.  The Debtor had only one client on which its reorganization depended.  The Firm recognized significant risks to its ability to recover any fees or reimbursement of expenses in this Case.  Nevertheless, the Firm saw this as a case that, if managed the right way, could produce positive results for the estate's unsecured creditors.

4.  Results Obtained from the Firm's Services

61.     Those results are now well within view.  Another factor relevant to a law firm's application for compensation in a bankruptcy case is the "results obtained" from the firm's services. *In re Village Apothecary, Inc.*, 45 F.4th 940, 947 (6th Cir. 2022).  If the Debtor had not filed bankruptcy, in time its secured lenders would have absorbed all of its incoming cash and forced the Debtor to shut down.  None of Debtor's unsecured creditors would have recovered anything.  If the Debtor had filed a petition under Chapter 7 of the Bankruptcy Code, a trustee would have avoided most of these security interests and recovered some accounts receivable.  Depending on the treatment of Mr. Bauman and Ms. Campbell's security interest in the Debtor's assets, the Debtor's priority unsecured creditors would have recovered somewhere between zero and 30% on their allowed claims The Debtor's general unsecured creditors would have recovered nothing in any event.

62.     Because of the risk the Firm was willing to accept and the services it has already rendered, the Debor has now proposed a plan of reorganization under which its priority unsecured creditors (including 32 former employees and 19 government agencies) are expected to recover 100% of their claims plus interest.  Under the same plan, the Debtor's general unsecured creditors could recover as much as 10% of their allowed claims, depending on the amount of accounts receivable the Debtor is able to recover and the U.S. Trustee' continuing demands in the Case.  This success is a factor weighing in favor of approval of the compensation sought by the Firm in this Case.

5.  Opposition Encountered

63.     Another factor relevant to a law firm's fee application in a bankruptcy case is the level of "opposition encountered" to the firm's efforts.  *In re Day*, 222 B.R. 587 (1997).  In the present Case, the Firm has been swimming upstream since the Petition Date.  This opposition has not come from the Debtor's secured lenders, its many priority unsecured creditors, its former employees' union or its general unsecured creditors.  The opposition has come from the U.S. Trustee, from his objection

during the first hearing to emergency payment of a COBRA insurance premium to his present Objection to this Application.  As noted above, to date, the Court has overruled most of these objections.

### 6. Preclusion of Other Employment

64.     Another factor relevant to a bankruptcy attorney's fee application is "the preclusion of other employment by the attorney due to acceptance of the case."  *In re Withington*, 654 B.R. 173, 184 (Bankr.S.D.Fla. 2023); *accord Spear*, 636 B.R. 765, 771.  Counsel is largely a solo practitioner. Counsel lost an opportunity to perform services for another client last December because he was too busy working on this Case.[8]  Because of the enormous amount of time Counsel has spent working on this Case since the Petition Date, Counsel has spent much less time marketing his practice than he otherwise would have.  This may have cost the Firm other opportunities.

### 7. Necessity of the Services

65.     A final factor relevant to a bankruptcy court's consideration of an attorney's fee application is whether the services for which the attorney seeks compensation were necessary to the success of the Case.  The U.S. Bankruptcy Court for the Eastern District of New York framed this issue as a question: "[T]o what extent will the estate suffer if the services are not rendered . . . ?"  *In re Shades of Beauty, Inc.*, 56 B.R. 946, 950 (1996).  All of the projects the Firm has undertaken in this Case have been necessary to the Debtor's reorganization, or at least to respond to the U.S. Trustee's demands.

66.     Necessity of services is a subject in tension with a subject discussed by the U.S. Trustee in his Objection: Congress' objective in the Small Business Reorganization Act of 2019 (SBRA) of reducing the cost Chapter 11 reorganizations for small businesses.   The Firm

---

[8] The other client initially delayed the project for performance during the first quarter of 2024.  However, at least as of the date of this Response, the project has been overcome by events that have rendered it unnecessary.

acknowledges this objective. SBRA has exempted the estate from some requirements of Chapter 11 that would otherwise have imposed additional costs, including quarterly fees to the U.S. Trustee and the burden of producing a disclosure statement.

67. However, SBRA left most of the procedural requirements of Chapter 11 intact for small businesses reorganizing under Subchapter V. The U.S. Trustee recites legislative history expressing a general objective of making small business reorganizations less costly, but makes no reference to any particular change SBRA made to the Bankruptcy Code that warrants reduction of the Firm's fees. SBRA implemented efficiencies for small businesses through specific changes to the Bankruptcy Code that are clearly defined and easily identified. A court should "not invoke [a] statute's supposed purpose or legislative history to create ambiguity where none exists." *U.S. v. Griffin*, 549 F.Supp. 49, 55 (D.D.C. 2021). In fact, "[g]iven a straightforward statutory command, there is no reason to resort to legislative history" at all. *Id.* If SBRA made any particular change to the Bankruptcy Code that calls into question the necessity of any of the tasks for which the Firm seeks compensation, the U.S. Trute should identify that change. However, Congress' general objective of reducing the costs of Chapter 11 for small businesses does not on its own, warrant a genera swipe at the Firm's fees.[9]

68. Nevertheless, it is worth considering whether there are any tasks the Firm performed that it should have left undone, in the interest of reducing costs to the estate. What challenges should the Firm have disregarded? Consider just a few past and present examples:

     a. The Firm recently discovered from a creditor that the Debtor owns eight laptop

---

[9] Another section of the Bankruptcy Code left unchanged by SBRA is Section 330(a)(3)(F), which entitles a professional to "compensation [that] is reasonable based on customary compensation charged by comparably skilled practitioners in cases other than cases under [the Bankruptcy Code]." "By enacting [Section 330(a)(3)(F)] in 1978, Congress placed bankruptcy lawyer compensation on par with that of other lawyers, underpinning the robust market for bankruptcy legal services that has developed since that time to today." *In re Blackwell*, Case No. 20-10130 (Bankr.D.Kan. Apr. 20, 2020) at *3. SBRA enacted no exception to this section and its standard for Subchapter V cases.

computers that the creditor has been storing for service.  Should the Firm produce and file an Amended Schedule A/B listing the laptop computers as an asset of the estate?  Or is that something the Firm can disregard to save fees?  For better or for worse, SBRA did nothing to exempt a small business from the requirement of Bankruptcy Rule 1007(b)(A) to file a "schedule[ ] of assets," or the duty implicit in Bankruptcy Rule 1007(k) to amend this schedule if it is found to be deficient.  The Firm will amend the schedule.  Will it be "excessive" if the Firm seeks compensation doing so?

b.      When the Firm learned, the day after the Petition Date, that eighteen of the Debtor's former employees would lose COBRA health insurance if the Debtor were not allowed to make a premium payment of just over $14,000 within the following two weeks, should the Firm have simply allowed the coverage to lapse and the estate to incur the potential resultant liability?  Or, in the interest of saving fees, should the Firm have advised the Debtor to sneak the premium payment through and hope no one noticed?  For better or for worse, SBRA did not amend Section 363 of the Bankruptcy Code to give the Firm a shortcut.  The Firm elected to play it safe and filed an emergency motion under Section 363(b).  Excessive?

c.      Counsel to the Campaign Workers' Guild, which represents most of the priority unsecured creditors in this Case, reviewed the proposed plan of reorganization the Debtor filed on March 11, 2024, and reached out to Counsel this week with a few questions. Should Counsel have ignored her because this is a small estate and the Firm's fees are already higher than expected?  Counsel responded to her.  Excessive?

d.      When the U.S. Trustee objected to the Firm's engagement, relying on arguments Counsel knew to be misplaced, should the Firm have not responded, or filed a perfunctory response with little preparation and allowed itself and the Debtor to risk a result that, as a practical matter, would likely have resulted in dismissal or conversion of this Case?

69.     The Firm could cite dozens more examples like these, arising from complexities one might not have anticipated from such a small estate, which the Firm would have been negligent to ignore.  SBRA provided no escape from performing these services.  Neither the size of the estate nor the fact that it is reorganizing under Subchapter V should impede the Firm's ability to recover fees for these services.

### Administrative Solvency of the Estate

70.     But what about the *solvency* of the estate?    The Firm acknowledges that "[p]rofessionals seeking compensation from a bankruptcy estate do so at risk that the estate will not have sufficient funds to satisfy their claims."  *In re Kids Creek Partners, L.P.*, 236 B.R. 871, 878 (Bankr.N.D.Ill. 1999).  The Firm accepted this Case with an awareness of that risk, and has continued to represent the Debtor for a calendar quarter with that awareness.  In his Objection, the U.S. Trustee expresses concerns over the administrative solvency of the estate in this Case.  Objection ¶¶ 29-30.

71.     In response, the Firm first submits that, contrary to the suggestion of the U.S. Trustee, the estate is not administratively insolvent.  As of this filing, the Debtor has $34,404.68 in its debtor-in-possession account.  This is a vast improvement over the negative balance with which the Debtor started on the Petition Date.  Moreover, these funds are no longer encumbered by any security interest except the one held by Mr. Bauman and Ms. Campbell, who have waived their right to adequate protection to support the Debtor's reorganization.  If the Debtor is allowed to continue generating the "$8,750 in monthly revenue from one contract" that the U.S. Trustee dismisses in his Objection, this will accumulate $472,500 in revenue over the 4.5-year term of the plan of reorganization the Debtor has proposed, with minimal operating costs.

72.     The most significant challenge to the Debtor's solvency has come from the U.S. Trustee himself.  His objections have been expensive to respond to, and have cost the Firm valuable time that could otherwise be spent pursuing the Debtor's accounts receivable, which have aged further

and thereby become less valuable to the estate.

73.     Moreover, solvency-related risk to a professional's ability to collect on legitimately earned fees should not be grounds for disallowance or reduction of those fees in the first place.  It should be enough risk to the Firm that there may not be sufficient funds over time for the Firm to collect whatever amount of fees the Court allows.

74.     In its Application, the Firm has proposed that its allowed fees be paid gradually, with the Debtor always retaining enough in its account to meet its other obligations.  In a Subchapter V case, the Bankruptcy Code accommodates payment of allowed attorney's fees over time, through a confirmed plan.  11 U.S.C. § 1191(e).  The Debtor can and will manage payment of the Firm's allowed compensation over time, in a manner that will preserve the Debtor's ability to meet other obligations.  Eventually, this will be regulated by terms in a confirmed plan.  If it needs to be regulated in the meantime by terms in the Court's order responding to the Application, it can be.

75.     Finally, the U.S. Trustee's concern over the ability of other professionals to collect on administrative claims in this Case is misplaced.  The Subchapter V Trustee's fees have been secured by monthly $1,500 deposits to her client trust account.  (She now holds $4,500 in trust.)  The entirety of Special Counsel's fee (inclusive of expenses) for the first phase of his services is secured by a $9,000 deposit the Debtor has made to his firm's client trust account.  (If Special Counsel elects to pursue an avoidance and recovery action in a second phase of services, the Debtor's engagement agreement with his firm provides for a contingent fee, inclusive of expenses.)  As of the date of this filing, the fees and reimbursable expenses incurred by the Debtor's accountant James Cobb total approximately $6,000, an amount the estate can manage, especially over time.

76.     As noted above, the Debtor is still in a position to carry out a plan of reorganization that will pay all of its priority unsecured creditors (including all of its former employees and over twenty taxing authorities) 100% of their allowed claims, and make some distribution to its general

unsecured creditors.  However, to achieve that result, the Debtor and the Firm need to be allowed to refocus their time and the Debtor's scarce resources on pursuit of the plan and recovery of any accounts receivable that can still be collected.  Getting the Debtor from the abyss in which it stood on the Petition Date to hopeful position it holds today has taken considerable effort, skill, risk, resistance to opposition and advancement of funds by the Firm.  The Firm is entitled to compensation for this, and submits that the amount sought in the Application is reasonable.

## <u>NOTICE</u>

77.      A copy of this Response has been served on the U.S. Trustee (the only party in interest that objected to the Application), the Subchapter V Trustee and all parties who have requested service of notices in this Case, via the Court's CM/ECF system.  The Firm submits that, under the circumstances, no further notice of this Response is required.

*Response concludes on next page.*

## **CONCLUSION**

WHEREFORE, the Debtor respectfully moves for this Court to enter an order, substantially in the form of proposed order submitted with the Application, (a) authorizing the Debtor to pay interim compensation in the amounts of fees and expenses requested, (b) directing the Debtor to do so over time as funds become available, while maintaining sufficient funds to pay its operating expenses in accordance with the budget submitted with the Cash Collateral Motion, and (c) providing such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

**LANNAN LEGAL PLLC**,

Dated: April 12, 2024

by: */s/ Robert W. Lannan*
_____
Robert W. Lannan (D.D.C. Bar. No. 454965)
Lannan Legal PLLC
1717 K Street, N.W., Suite 900
Washington, D.C. 20006
Tel.: (202) 223-8901
Fax: (202) 747-7760
Email: robert.lannan@lannanlegal.com

*Counsel to the Debtor and Debtor in Possession*