Robert W. Lannan (D.D.C. Bar No. 454965)
Lannan Legal PLLC
Washington, D.C. 20006
Telephone: (202) 223-8901
e-mail: robert.lannan@lannanlegal.com

*Counsel to the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | ) |
| | ) |
| REPMGMT INC. CHARTERED, | ) Case No. 23-00375 |
| d/b/a Fireside Campaigns, | ) |
| | ) Chapter 11 |
| Debtor | ) |
| | ) |

## REVISED SUBCHAPTER V PLAN

RepMGMT, Inc. Chartered (the "**Debtor**"), the debtor and debtor-in-possession in the above-captioned case (this "**Case**"), by and through its undersigned counsel, submits this Revised Subchapter V Plan (this "**Plan**") pursuant to Sections 1189, 1190 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* the "**Bankruptcy Code**"). As its Plan, the Debtor respectfully proposes as follows:

## BACKGROUND

A.     **Description and History of the Debtor's Business.**

The Debtor is a corporation organized and existing under the laws of the District of Columbia. Since 2018, the Debtor has been in the business of political consulting. The Debtor has provided political and public relations advice to progressive organizations and the campaigns of progressive candidates.

The Debtor's business grew until it reached a peak in 2022, a midterm election year. At that time, the Debtor had five shareholders, each of whom was also a director of the corporation (with three of the five serving as officers), as well as over 70 employees, and advised campaigns nationwide. While the Debtor generated more business, and earned more fees, in 2022 than it had during any earlier year, it did not generate as much revenue that year than it had expected. This did not prevent the Debtor from incurring significant debt to trade creditors and obligating itself to a large number of employees. Inflation and higher cost of living also increased the Debtor's payroll and other operating expenses that year. During 2023, the Debtor experienced a greater decline than it had expected for a non-election year. The Debtor turned to lenders to provide badly-needed working capital, incurring a significant debt service costs. Secured lenders from which the Debtor borrowed money included American Express National Bank ("**American**

Express"), Channel Partners Capital, LLC ("**Channel Partners**") and Headway Capital, LLC ("**Headway**").

On April 1, 2023, one of the Debtor's shareholders entered into a Share Purchase and Separation Agreement with the Debtor and its Chief Executive Officer Bradley Bauman ("**Mr. Bauman**"), pursuant to which she sold all of her shares in the Debtor to Mr. Bauman for Ten Dollars ($10.00) and resigned from her positions as a director and officer of the Debtor. On August 11, 2023, three more of the Debtor's shareholders entered into a Share Transfer Agreement with the Debtor, pursuant to which they resigned their positions as officers and directors of the Debtor and conveyed all of their shares to the Debtor in exchange for general releases of liability from the Debtor and no cash payments. Since August 11, 2023, Mr. Bauman has been the Debtor's only shareholder, director and officer. Mr. Bauman operates the Debtor from his home (without charging rent) and has not collected a salary from the Debtor since October 2023. The Debtor currently serves one client: the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), with which the Debtor has a long-standing relationship.

The Debtor also implemented a series of layoffs in 2023. In October 2023, the Debtor laid off the last eighteen of its employees. The Debtor did not have enough cash on hand to pay these employees' final paychecks. On October 27, 2023, Mr. Bauman and his wife loaned $60,000 to the Debtor to provide the Debtor sufficient funding to pay these final paychecks. This loan was made under a credit facility pursuant to which Mr. Bauman and his wife ultimately loaned $65,500 to the Debtor before it filed its bankruptcy petition on December 12, 2023. This credit facility consisted of a series of promissory notes, a security agreement and a financing statement (the "**Bauman Credit Facility**"). The Debtor signed the later promissory notes to finance prepetition fees of its legal counsel, Lannan Legal PLLC ("**Lannan Legal**").

On December 12, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing this Case in the United States Bankruptcy Court for the District of Columbia (the "**Court**"). The Debtor elected to file this Case as a small business debtor under Subchapter V of Chapter 11. Therefore, a Subchapter V Trustee has been appointed in the Case, Ms. Joleene E. Wee, of JW Infinity Consulting (the "**Subchapter V Trustee**"). Since the Petition Date, the Debtor has continued to operate its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No Chapter 11 trustee or examiner has been appointed in the Case.

The Debtor has pursued three adversary proceedings in the Case, under which it successfully avoided security interests and, in one instance recovered payments, all of which had been transferred by the Debtor to lenders during the 90-day preference period before the Petition Date: *RepMGMT, Inc. Chartered v. American Express National Bank* (Adv. No. 24-10003); *RepMGMT, Inc. Chartered v. Channel Partners Capital, LLC* (Adv. No. 24-10004); and *RepMGMT, Inc. Chartered v. Headway Capital, LLC* (Adv. No. 24-10005). The Debtor reached settlements with all three of these defendants. Under the settlement agreement between the Debtor and Headway, Headway agreed to relinquish any security interest in the Debtor's assets in exchange for allowance of a general unsecured claim in the amount of $15,555.60. Under the settlement agreement between the Debtor and Channel Partners, Channel Partners agreed to

relinquish any security interest in the Debtor's assets in exchange for allowance of general unsecured claim in the amount of $126,999.  Under an Agreed Order of Judgment signed by the Debtor and American Express, American Express agreed to pay the Debtor $17,500 as avoided and recovered preference payments, and to relinquish any security interest in the Debtor's assets, in exchange for allowance of general unsecured claims in amounts totaling $66,222.35.  The Court entered orders approving all three settlements.  The Debtor collected $17,500 from American Express.

On February 16, 2024, the Court entered an order approving the Debtor's application to employ Lannan Legal as its bankruptcy counsel in the Case.  Because of Lannan Legal's involvement in the drafting of the Bauman Credit Facility and other prepetition transactions, the Court conditioned its approval on the Debtor engaging special counsel for the purpose of reviewing all prepetition transactions in which Robert W. Lannan and/or Lannan Legal represented the Debtor to determine whether it was in the best interest of the Estate for the Debtor to pursue actions for avoidance and recovery against any non-debtor parties arising out of such transactions.  Upon recommendation of the Subchapter V Trustee and with the Court's approval, the Debtor engaged Hirschler Fleischer, PC ("**Special Counsel**") to perform this function.  Special Counsel reviewed documents related to four matters in which Lannan Legal had represented the Debtor before the Petition Date: (1) the Bauman Credit Facility; (2) a Share Transfer Agreement between the Debtor and three of its shareholders, pursuant to which the shareholders transferred their shares to the Debtor in exchange for general releases; (3) the Debtor's re-employment of one former shareholder after she had transferred her shares; and (4) the Debtor's layoff announcement in October 2023 to all of its then-remaining employees.  After reviewing these documents, interviewing Mr. Bauman and previewing a draft report with the Subchapter V Trustee and the Office of the U.S. Trustee, Special Counsel filed a report in the Case in which Special Counsel "conclude[ed] that none of the [reviewed] [t]ransactions g[ave] rise to a viable claim of the bankruptcy estate and [that] it would not be in the best interest of the estate to pursue actions for avoidance and recovery against any non-debtor party or parties to the[se] Transactions."  Report of Special Counsel, Docket No. 201 p. 2.

B.     **Liquidation Analysis.**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation.

This Plan relies on the Debtor continuing to provide political consulting services for one anchor client and possibly others throughout a 4.5-year term, with very low operating costs.  The Debtor operates from the home of its sole shareholder, director and officer, Bradley Bauman, without paying rent.  Mr. Bauman does not draw any salary, and will not draw any salary during the term of this Plan unless the Debtor's revenues increase substantially from what it projected here.  The Debtor will use the profits generated from this business to make payments to its creditors under the Plan.

If the Debtor were forced to liquidate under Chapter 7, it would shut down and generate no future income.  The Debtor owes its priority unsecured creditors (consisting of government

agencies and former employees of the Debtor) a total of $99,931.80.  The Debtor owes its non-priority unsecured creditors a total of $1,357,504.51.  The only significant assets of the estate available for a Chapter 7 trustee to liquidate would be the Debtor's accounts receivable and an action to recover preference payments made to one of its creditors, American Express National Bank.  The Debtor now estimates that it will succeed in collecting $20,000 of its accounts receivable, either by pursuing these claims directly or selling them.  The Debtor assumes that a Chapter 7 trustee would have the same success.  The Debtor has collected $17,500 from American Express in a settlement of that avoidance action (Adv. No. 24-10003).  The Debtor assumes a Chapter 7 trustee would attain the same result.  The total of these amounts is $37,500.  If a Chapter 7 trustee's fees were $7,500, this would leave $30,000 for distribution to all creditors.

The Debtor has scheduled a secured claim of its sole shareholder and his wife, Bradley Bauman and Autumn Campbell, in the amount of $65,500.  This claim arises from the Bauman Credit Facility.  Upon review of the Bauman Credit Facility, Special Counsel concluded that it would not be in the best interest of the Estate for the Debtor to seek to avoid the security interest underlying this claim.  *See* Special Counsel Report pp. 2-4.  Assuming that a Chapter 7 trustee would reach the same conclusion, in a Chapter 7 liquidation, Mr. Bauman and Ms. Campbell would recover 45.8% of their claim, while priority unsecured creditors and general unsecured creditors would recover no amount on their claims.

On the other hand, if the Debtor is allowed to continue operating under Chapter 11, during the term of the Plan, the Debtor expects to generate at least $472,500 in revenue.  Given the Debtor's very low operating costs, the vast majority of this revenue will be available for distribution to creditors.  In the projection attached to this Plan as Exhibit A, the Debtor assumes certain administrative expenses of administering a plan confirmed with the consent of all classes of creditors.  Based on these projections, the Debtor expects all priority unsecured creditors to receive a 100% recovery on their claims, including interest accruing from the Effective Date at an annual percentage rate of 5%.  The Plan subordinates the secured claim of Bradley Bauman and Autumn Campbell to these priority unsecured claims.[1]  Therefore, if the Plan is confirmed, Mr. Bauman and Ms. Campbell will not recover any amount on their claim until the priority unsecured creditors have been paid in full.  The Debtor anticipates that, under a confirmed Plan, Mr. Bauman and Ms. Campbell will later recover 100% of their secured claim, but without any interest.  Finally, based on the Debtor's projections and assumptions, it estimates that the general unsecured creditors will recover 16.8% of their claims under this Plan.

**Exhibit A** of this Plan is a projection of cashflow, post-confirmation expenditures and distributions throughout the 4.5-year term of the Plan.  The projections in Exhibit A presume that the Plan will be confirmed consensually.  If it is not confirmed consensually, the estate will incur additional fees for disbursing services, as provided below, and this will result in lower distributions to general unsecured creditors.

*Prepetition Payments to Insiders.*  As part of its liquidation analysis, the Debtor discloses that it made the following payments to its shareholders within one year before the Petition Date as salaries and distributions:

---

[1] If a Chapter 7 trustee were not able to avoid the security interest the Debtor transferred to Mr. Bauman and Ms. Campbell, this subordination would not occur.

| Shareholder | Total of K-1 Distributions | Dates of K-1 Distributions | Total of W-2 Salary Payments | Dates of W-2 Salary Payments |
|---|---|---|---|---|
| **Bradley Bauman** Director, Officer and full-time employee | $12,502.20 | 12/15/22-1/31/23 | $132,093.70 | 12/15/22-10/16/23 |
| **Maria de Pilar Tobar** Director and full-time employee | $16,757.76 | 12/15/22-3/31/23 | $135,336.34 | 12/15/22-10/16/23 |
| **Julia Rosen Chaplin** Director, Officer and full-time employee | $18,574.72 | 12/15/22-3/31/23 | $43,292.61 | 12/15/22-4/14/23 |
| **Samuel Nitz** Director, Officer and full-time employee | $9,287.36 | 12/15/22-1/31/23 | $34,956.80 | 12/15/23-3/31/23 |
| **Tim Lim** Director and part-time employee | $4,643.68 | 12/15/22-1/31/23 | $5,732.92 | 12/15/22-1/31/23 |

The above five people were the Debtor's only shareholders.  Each of these shareholders was a director of the Debtor and all but two of them also served as officers of the Debtor.  For tax purposes, the Debtor is an S-corporation.  Since its inception in 2018, the Debtor compensated its shareholders through a combination of salaries and shareholder distributions.  When the Debtor's financial performance began to fail, it stopped making shareholder distributions to all but two of its shareholders after January 31, 2023, and to the those two after March 31, 2023.  At different times in 2023, all but one of its shareholders (Mr. Bauman) also stopped performing services as directors and officers.

(1)  On February 1, 2023, **Tim Lim** stopped performing services as a director of the Debtor and therefore stopped drawing a salary.  However, he maintained his equity interest in the Debtor.

(2)  In March 2023, **Samuel Nitz** stopped working full-time for the Debtor, but retained his equity interest in the Debtor.  He received his last salary payment on March 31, 2023.

(3)  On April 1, 2023, **Julia Rosen Chaplin** conveyed all of her shares in the Debtor to Bradley Bauman, and resigned from her positions as a director or officer of the Debtor.  On March 14, 2023, she received her final salary payment for services as an officer to the Debtor.

(4)    On August 11, 2023, Tim Lim, Samuel Nitz and Maria Tobar conveyed to the Debtor all of their shares in the Debtor, and resigned all of their positions as directors and officers of the Debtor.  Later in August 2023, the Debtor hired **Maria Tobar** to continue to perform services as an employee (but not as an officer or director, and without any ownership interest in the Debtor).  She continued to perform services and receive a salary until early October 2023.  She received her last salary payment on October 16, 2023.

(5)    October 16, 2023 was also the last day on which **Bradley Bauman** received any salary payment.  Since that date, he has continued to perform services for the Debtor without compensation.  Since August 11, 2023, he has been the Debtor's only shareholder, officer or director.

The Debtor has considered whether it would be beneficial for the Estate to pursue preference or fraudulent conveyance actions to recover any of the above payments from its current and former shareholders, and has concluded that it would not be in the best interest of the Estate to pursue any such action.

The Debtor believes that each of the shareholders would have a complete defense to any action under Sections 547 and 550 of the Bankruptcy Code to avoid and recover the above payments as preferential, because the transfers were all made in biweekly and monthly increments, following the Debtor's ordinary course of business.  See 11 U.S.C. § 547(c)(2).  Moreover, they were substantially contemporaneous exchanges for new value given to the Debtor in the form of services provided by the shareholders.  *Id*. § 547(c)(1).  Finally, in at least one instance, any preference liability would be offset by new value subsequently provided to the Debtor without compensation: Mr. Bauman has been providing services to the Debtor without any compensation since October 2023.

The Debtor also believes it would also be difficult-to-impossible for the Estate to avoid most or all of the above payments as fraudulent conveyances, under either Section 548 of the Bankruptcy Code or Section 544(b) of the Bankruptcy Code in conjunction with the District of Columbia Fraudulent Conveyance Act, D.C. Code §§ 28-1301 *et seq*.

- To avoid any of these payments under Section 548(a)(1)(A) of the Bankruptcy Code, there would have to have been "actual intent to hinder, delay or defraud" the Debtor's creditors. Likewise, a corollary section of the D.C. Fraudulent Conveyance Act would require proof of "actual intent to hinder, delay or defraud [a] creditor[.]"  D.C. Code § 28-1304(a)(1). There is no evidence of any such intent.  To the contrary, the consistency of the payments with the Debtor's ordinary course of business refutes any such theory.

- To avoid any payment under either Section 548(a)(1)(B) of the Bankruptcy Code or its corollary section of the D.C. Fraudulent Conveyance Act, the Debtor would have to prove (among other things) two elements that would be difficult to establish for most or all of the payments.

o   First, for each payment sought to recovered, under the Bankruptcy Code, the Debtor would have to prove that it "was insolvent" on the date of the payment or "became insolvent as a result of" the payment. *Id*. § 548(a)(1)B(ii)(I). The corollary sections of D.C. Fraudulent Conveyance Act have similar requirements for the Debtor to prove insolvency at the time of any challenged payment. D.C. Code §§ 28-1304(a)(2) and 1305. Review of the Debtor's monthly profit and loss statements show that the Debtor did not begin experiencing consistent monthly operating losses until November 2022. Indeed, the Debtor yielded a profit for 2022 as a whole. It was not until late 2022 that the Debtor began experiencing a steep decline in business and recovery on accounts receivable. It would be difficult to establish that the Debtor was insolvent when several of the above payments were made.

o   More significantly, to recover any of the above payments, the Debtor would have to prove that it did not receive "reasonably equivalent value" in exchange. *See* 11 U.S.C. § 548(a)(1)(B)(i) and D.C. Code § 28-3108(a). It is common for an S-corporation to compensate shareholders who also perform services for the corporation as directors and officers through a combination of salaries and shareholder distributions. The Debtor followed this practice. The Debtor is confident that it received more than a "reasonably equivalent value" from these shareholders, in the form of their services, in exchange for these payments. The North American Industry Classification System (NAICS) code assigned by the U.S. Census Bureau to the Debtor's industry ("Political consulting services") is 541820. The Census Bureau has assigned the same NAICS code to "Public relations agencies," "Public relations consulting services" and "Public relations services." *See* U.S. Census Bureau, North American Industry Classification System, NAICS Search.[2] The U.S. Bureau of Labor Statistics reports mean and median salaries of people performing various functions in various industries. No report is available for "political consulting" professionals. However, the agency has reported on compensation of "Public Relations and Fundraising Managers." It reports that "[t]he **median** annual wage for public relations managers was **$134,760** in May 2023." U.S. Bureau of Labor Statistics, Occupational Outlook Handbook, Public Relations and Fundraising Managers.[3] The same agency reports that the "[a]nnual **mean** wage" for Public Relations and Fundraising Managers in May 2023 was **$196,350**. U.S. Bureau of Labor Statistics, May 2023 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 541800.[4]

All of the Debtor's shareholders performed managerial services for the Debtor. The following was their compensation in 2022:

| Shareholder | Position | 2022 Salary | 2022 Distributions | 2022 Total Compensation |
|---|---|---|---|---|
| Bradley Bauman | President | $80,273.79 | $79,683.07 | $159,956.86 |
| Julia Chaplin | Head of Digital | $101,019.39 | $59,579.82 | $160,599.21 |

[2] Available at <https://www.census.gov/naics/?input=541820&year=2022&details=541820>.

[3] Available at <https://www.bls.gov/ooh/management/public-relations-managers.htm>.

[4] Available at < https://www.bls.gov/oes/current/naics4_541800.htm>.

| | Fundraising and Advertising | | | |
|---|---|---|---|---|
| Samuel Nitz | Treasurer and Director of Analytics | $101,014.74 | $59,579.82 | $160,594.56 |
| Maria Tobar | Director of Communications Department | $68,950.80 | $31,420.80 | $100,371.60 |
| Tim Lim | Senior Advisor on Development | $8,599.38 | $23,780.26 | $32,379.61* |

*In addition to the above total amount, Tim Lim was paid $4,933.46 in 2022 for work he performed for the Debtor as an independent contractor.

At the beginning 2023, the Debtor planned to compensate its shareholders at the following rates for that year:

| Shareholder | Position | Intended 2023 Salary | Intended 2023 Distributions | Total Compensation Intended for 2023 |
|---|---|---|---|---|
| Bradley Bauman | President | $92,713.14 | $81,264.30 | $173,977.44 |
| Julia Chaplin | Head of Digital Fundraising and Advertising | $113,617.66 | $60,367.84 | $173,985.50 |
| Samuel Nitz | Treasurer and Director of Analytics | $113,609.60 | $60,367.84 | $173,977.44 |
| Maria Tobar | Director of Communications Department | $119,514.72 | $54,462.72 | $173,977.44 |
| Tim Lim | Senior Advisor on Development | $37,263.98 | $30,183.92 | $67,447.90 |

*This salary rate began when Ms. Tobar transitioned from part-time to full-time work for the Debtor in April 2023.

The above figures were never actualized in 2023 because the Debtor stopped making distributions and stopped employing the shareholders, as noted above.

Including both salaries and distributions, all of the shareholders were compensated for these services to the Debtor in 2022 and 2023 at rates below the national average reported by the Bureau of Labor Statistics for Public Relations and Fundraising Managers.  Most of the shareholders were compensated above the national *median* annual wage reported by the Bureau of Labor Statistics for Public Relations and Fundraising Managers.  However, the Debtor is mindful that the Bureau of Labor Statics reported a *national* median figure, and that upward adjustments are appropriate for the higher-than-average cost of living in the Washington, D.C.

metropolitan area, where all but one of the shareholders were based.  (The fifth, Julia Chaplin, was based in Los Angeles, another market with a high cost of living.)  The Debtor is also mindful that the shareholders managed a nationwide practice, based in the Nation's Capital, which included advising national organizations and campaigns for federal offices.  These factors all justify compensation of some of the Debtor's shareholders at above the national median wages for managerial services in the Debtor's industry.

Other providers of information on market compensation confirm that the Debtor's shareholders were compensated below-market.

- Salary.com reports that as of April 24, 2024, the average Chief Public Relations Executive salary in the United States is $250,800.  *See* Salary.com, Chief Public Relations Salary in the United States.[5]

- Comparably, Inc. reports that, as of April 2024, Digital Marketing Agency executives are paid average compensation of $219,186 and median compensation of $232,280.  Comparably, Digital Marketing Agency.[6]

- According to an article published on the website of O'Dwyers PR, an authority in the public relations and marketing communications industries, "It's not uncommon for a PR agency owner of a $500,000 firm to take in at least $250,000.  Nor is it uncommon for a PR agency doing $3 million in fees to generate almost $1 million for its owner. . . . A key number two senior manager in a $5 million agency may earn a salary of around $250,000."  Art Stevens, "PR's Best-Kept Secret: Agency Owner Wealth, O'Dwyer's.[7]  The Debtor at one time earned revenues in excess of $15 million.

For the above reasons, the Debtor believes that it would not be in the best interest of the Estate to pursue avoidance actions against its current and former shareholders to recover any of the above payments.

The Debtor notes that its Special Counsel came to essentially the same conclusion in its report.  One of the transactions Special Counsel reviewed was a Share Transfer Agreement pursuant to which three shareholders transferred all of their shares in the Debtor, each in exchange for a general release from liability.  Special Counsel assumed that the shares had no value and considered the question of whether the Debtor had transferred anything of value to the shareholders when it gave them a general release.  Among the documents that Special Counsel reviewed were the Debtor's monthly financial statements for the period in question.[8]  In its report, Special Counsel made note of the Debtor's identification, in its Statement of Financial

---

[5] Available at <https://www.salary.com/research/salary/alternate/chief-public-relations-executive-salary>.
[6] Available at <https://www.comparably.com/companies/digital-marketing-agency/executive-salaries>.
[7] Available at <https://www.odwyerpr.com/story/public/17915/2022-05-12/prs-best-kept-secret-agency-owner-wealth.html>.
[8] The Debtor makes this disclosure while reserving the work product privilege and attorney-client privilege generally.

Affairs, of salaries and distributions paid to the three shareholders and continued, "For each, a small portion of the compensation was designated as K-1 distributions, but this matter of payroll accounting was discontinued for Lim and Nitz in January 2023 and for Tobar in March 2023. All compensation thereafter was in the form of salary." Special Counsel Report p. 5. These considerations contributed to Special Counsel's conclusion that "it is not in the best interest of the [Estate] to pursue actions for avoidance and recovery against any party, relating to the [t]ransactions" that Special Counsel reviewed, Special Counsel Report p. 6, including the Share Purchase Agreement's release of three shareholders from (among other things) any fraudulent conveyance actions. The same reasoning could be applied to distributions to the two shareholders who were not parties to the Share Purchase Agreement, because they also stopped receiving shareholder distributions in January and March 2023.

C.    **Ability to make future plan payments and operate without further reorganization.**

As the proponent of this Plan, the Debtor must also show that it will have enough cash over the term of the Plan to make the required Plan payments and to operate the Debtor's Business.

The Debtor will fund this Plan primarily from revenue it expects to receive from its anchor client over the 4.5-year life of the plan, which will total $472,000. The Debtor also expects to collect about $20,000 from its accounts receivable. (The Debtor is exploring the possibility of selling its accounts receivable instead of pursuing them directly.) After factoring in projected administrative expenses, the Debtor expects to have projected disposable income of nearly $400,000 over the 4.5-year term of the Plan. *See* 11 U.S.C. § 1191(c)(2).

The Debtor proposes that the Plan become effective on the date that is fourteen (14) days after the date of confirmation of the Plan or, if that date is not a business day, the first business day thereafter; provided, however, that if a stay of the confirmation order is in effect on the date when the Plan would otherwise become effective, then the Plan shall become effective on the first business day after the date on which the stay expires or is otherwise terminated.

The Debtor is proposing a Plan that will be effective for a period of **four and one half years**. Assuming an Effective Date of August 21, 2024, the Debtor expects the final distribution to be made on or about December 31, 2028.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to the projections made in this Plan.**

## ARTICLE 1: SUMMARY

1.0    If confirmed, this Plan will pay creditors mostly from the profits of the Debtor's business during the 4.5-year term of the Plan, and also from collections the Debtor makes on its accounts receivable or a sale of its accounts receivable. This Plan provides for one class of priority claims, one class of secured claims, one class of non-priority unsecured claims, and one class consisting of its single equity security holder.

## ARTICLE 2: CLASSIFICATIONS OF CLAIMS AND INTERESTS

2.01    Class 1.   All allowed claims entitled to priority under Section 507(a) of the Bankruptcy Code, except administrative expense claims under Section 507(a)(2) and priority tax claims under Section 507(a)(8).   All of the claimants in this class are former employees of the Debtor.  Their claims are for unpaid employee benefits and severance payments.  The total of the claims in this class $59,690.78.  If confirmed, the Plan will pay these claims in full, with interest at a rate of five percent (5%) accruing from the Effective Date.

2.02    Class 2.   The claim of Bradley Bauman and Autumn Campbell identified in the Debtor's current version of Schedule D.  The Debtor proposes to subordinate this claim to (a) all claims in Class 1 and (b) all Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees, which are discussed in Article 3 of this Plan.  The total amount of this Claim is Sixty-Five Thousand Five Hundred Dollars ($65,500).  If confirmed, the Plan will pay this claim in full, with no interest.

2.03    Class 3.   All non-priority unsecured claims allowed under Section 502 of the Bankruptcy Code.  After all of the above claims have been paid in full, the Debtor will pay these claims on a *pro rata* basis until the end of the term of this Plan. The Debtor expects these creditors to recover 16.8% of their allowed claims.  The Debtor expects payments on these claims to begin in September 2026.

2.04    Class 4.   All equity interests of the Debtor.  Mr. Bauman is the sole remaining shareholder of the Debtor.  Mr. Bauman will receive no cash distribution under this Plan.  When the Plan has been completed, Mr. Bauman will retain his equity interest in the Debtor.

## ARTICLE 3:  TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND QUARTERLY AND COURT FEES

3.01    Unclassified claims.    Under Section 1123(a)(1) of the Bankruptcy Code, administrative expense claims and priority tax claims are not in classes.

3.02    Administrative expense claims.   The holders of allowed administrative expense claims allowed under Section 503 of the Bankruptcy Code shall be paid as follows:

a.      *Subchapter V Trustee's Fees*.   The Debtor has been making monthly deposits of $1,500 to the Subchapter V Trustee, which she has been holding in a trust account.  The Subchapter V Trustee shall be permitted to withdraw from her trust account the total of any fees and expenses that have been approved by the Court, upon the earlier to occur of (1) the Effective Date or (2) the date the Court approves such fees and expenses.  If the total of the Debtor's deposits in the Subchapter V Trustee's trust account at any point in time (the "**Trust Account Balance**") is insufficient to pay her approved fees and expenses, then the Debtor shall pay the balance as soon as funds become available to the Debtor.  If this Plan is confirmed with the consent of all classes of creditors, then the Subchapter V Trustee shall return to the Debtor any Trust Account Balance remaining after she has been paid and reimbursed all of her fees and expenses

accrued in this Case.  If the Court confirms this Plan without the consent of all classes of creditors, then Subchapter V Trustee shall act as the disbursing agent and be compensated as provided in Section 10.02(c) of this Plan.  She shall be permitted to retain any Trust Account Balance remaining on the Effective Date and use the Trust Account Balance to offset her initial fees for disbursing services.

   b. *Court-Approved Fees and Expenses of the Debtor's Professionals.*

    (1) **Hirschler Fleicher**.  The Debtor has already paid Special Counsel a flat fee of $9,000 for its services.  Special Counsel stated in its report that it did not believe further services of Special Counsel were necessary.

    (2) **James Cobb.**  The Debtor estimates that, as of the Effective Date, James Cobb will have accrued $7,500 in fees and expenses for which he will apply to the Court for reimbursement by the estate.  The Debtor will pay Mr. Cobb all of his outstanding allowed fees and expenses upon the earlier to occur of (1) the Effective Date or (2) the date the Court approves such fees and expenses.  Through the term of the Plan, Mr. Cobb may provide post-confirmation accounting services to the Debtor on the same terms as approved by the Court for his post-petition accounting services.  The Debtor has budgeted to incur $5,000 in post-confirmation accounting expenses during each of the years from 2024 through 2028.  Mr. Cobb shall not be required to apply to the Court for approval of post-confirmation fees and expenses, unless they exceed $5,000 per calendar year.[9]  Mr. Cobb has approved of all of these terms.

    (3) **Lannan Legal PLLC.**  On May 13, 2024, the Court entered an order awarding Lannan Legal interim compensation of $34,269 in fees and $5,446 in expenses (a total of $39,715) for services rendered from the Petition Date through March 19, 2024.  The Debtor paid $35,000 of this total to Lannan Legal on May 21, 2024 and expects that, by the time this Plan is approved for balloting, it will have paid the balance of the total to Lannan Legal.  The Debtor is budgeting an additional $32,054 for fees and expenses incurred by Lannan Legal from March 20, 2024 through the date of confirmation of this Plan.  As a precaution, the Debtor is budgeting more than the actual amount of legal fees and expenses it expects to be approved.  If any balance of the approved amount remains unpaid after the Effective Date of the Plan, then the Debtor will make quarterly payments to Lannan Legal from available funds until the balance of Lannan Legal's court-approved fees and expenses have been paid.  The Debtor has budgeted $500 per month for post-confirmation legal expenses.  The Debtor will exercise commercially reasonable efforts to minimize post-confirmation legal expenses.  However, the Debtor needs funds to be available to respond to any unforeseen legal challenges that may arise during the term of the Plan.  Lannan Legal has approved of these terms.

   b. **Paycor, Inc**.  The Debtor laid off the last of its employees before the Petition Date.  However, since the Petition Date, the Debtor's payroll service provider, Paycor, Inc., has provided administrative services related to the Debtor's previous

---

[9] For the avoidance of doubt, any fraction of a calendar year during the term of this Plan shall be treated as a calendar year for purposes of this $5,000 projection and threshold.

employment of employees in 2023 (including, for example, production and distribution of W-2 statements to the Debtor's former employees).  For these post-petition services, Paycor has sent the Debtor invoices totaling $2,254.64.  The Debtor proposes to pay this amount in full to Paycor in September 2024.

   c. ***Any Other Administrative Expenses Approved by the Court.*** If the Debtor believes it necessary to incur any other administrative expenses in this Case, then the Debtor may file motions or applications with the Court for approval of such expenses. If such expenses are approved by the Court, then the Debtor shall pay such expenses immediately if funds are available and the Court has found that immediate payment is necessary to avoid immediate and irreparable harm to the estate.  Otherwise, approved expenses shall be paid on a *pro rata* basis with other approved administrative expenses, on a monthly basis as funds become available.

   3.03 Priority tax claims.  Each holder of an allowed priority tax claim will be paid in full over the term of the Plan, with interest accruing from and after the Effective Date at a rate of five percent (5%).  The Debtor has not disputed any priority tax claims it has scheduled and does not intend to object to any priority tax claims for which proofs of claim have been filed as of the date of this Plan.  (The deadline for government proofs of claim in this Case is June 10, 2024.) The Debtor anticipates that the total amount of priority tax claims will be $40,107.68.

   3.04 Statutory fees.  All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the Effective Date of this Plan have been paid or will be paid on the Effective Date.

### ARTICLE 4:  TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – Priority claims excluding those in Article 3 | Unimpaired | Class 1 is unimpaired by this Plan.  Before Class 2 or 3 claimants receive any payment, each holder of an allowed Class 1 claim will be paid a *pro rata* portion of the holder's allowed priority claim on a quarterly basis, based on the availability of cash to the Debtor, until such claim has been paid in full, including interest at rate of 5% accruing from the Effective Date. The Debtor projects that the creditors in Class 1 will recover 100% of their allowed claims, plus the aforementioned 5% interest. |
| Class 2 – Secured Claim of Bradley Bauman and Autumn Campbell | Impaired | Class 2 is impaired by this Plan because it will be paid without interest.  After all allowed Class 1 claims have been paid in full, the Debtor will pay the secured claim |

| | | |
|---|---|---|
| | | of Bradley Bauman and Autumn Campbell (assuming Special Counsel does not pursue and obtain avoidance of the security interest) in installments based on the availability of cash to the Debtor until this claim has been paid in full.  Bradley Bauman and Autumn Campbell have voluntarily elected to subordinate their secured claim to the priority unsecured claims of Class 1.  The Debtor projects that Mr. Bauman and Ms. Campbell will recover 100% of this claim, without interest. |
| Class 3 – Non-priority unsecured creditors | Impaired | Class 3 is impaired by this Plan.  To the extent that cash becomes available during the term of the Plan, after holders of priority tax claims, Class 1 claimants and Class 2 claimants have been paid in full, the Debtor will pay each holder of a non-priority unsecured claim a *pro rata* portion of such claim, on a quarterly basis, based on the availability of cash to the Debtor until the Plan period expires.  The Debtor projects that Class 3 creditors will recover 16.8% of their allowed claims. |
| Class 4 – Equity security holders of the Debtor | Impaired | The Debtor does not expect its sole equity security holder (Bradley Bauman) to receive any cash distribution under the Plan on account of his equity interest in the Debtor.  Mr. Bauman will retain his equity interest in the Debtor. |

## ARTICLE 5:  ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claims.  A "**Disputed Claim**" is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (2) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.  The Debtor does not expect there to be any Disputed Claims.

5.02    Disputed Claims Reserve.  In the unlikely event that there are any Disputed Claims, the Debtor shall open a separate debtor-in-possession account at Truist Bank (the "**Reserve Account**").  Each time the Debtor or the Subchapter V Trustee (as appropriate) makes a disbursement to claimants, the Debtor shall deposit into the Reserve Account, for each Disputed

Claim, the amount (if any) that would have been disbursed to that claimant as part of that disbursement if the claim were not a Disputed Claim.  For each Disputed Claim, the Debtor shall retain all amounts deposited into the Reserve Account until the Court has ruled on the objection. If the Court sustains an objection to a Claim, then the Debtor may return the amount reserved for that claim to the Debtor's principal debtor-in-possession account.  If the Court overrules the objection, then the Debtor or the Subchapter V Trustee (as appropriate) shall disburse the amount reserved to that claimant.  The Debtor shall be permitted to comingle, in the Reserve Account, all deposits made for Disputed Claims.

5.02    Delay in Distribution of a Disputed Claim.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03    Settlement of Disputed Claims.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE 6: PROVISIONS FOR
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    The Debtor assumes the following executory contracts as of the Effective Date:

a.    Unity Table Consulting Agreement, dated January 10, 2022, between the Debtor and the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) on behalf of participating labor organizations

b.    Collective Bargaining Agreement, effective April 28, 2022, between RepMGMT, Inc. Chartered and the Campaign Workers Guild

c.    Business Owners Advantage commercial general liability insurance policy agreement, dated January 4, 2024, between RepMGMT, Inc. Chartered and The Hannover Insurance Group

d.    Agreement, dated April 1, 2023, between RepMGMT, Inc. Chartered and Groundswell Public Strategies, Inc., d/b/a GPS Impact

6.02    Except for the executory contracts identified in Section 6.01, the Debtor will be conclusively deemed to have rejected all executory contract and unexpired leases as of the Effective Date.

6.03    A proof of claim arising from rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

## ARTICLE 7: MEANS FOR IMPLEMENTATION OF THE PLAN

7.01    The Debtor intends to implement its Plan by continuing to earn fees for its services

while operating at very low costs.  The Debtor currently has one client, the AFL-CIO, with which the Debtor has a years-long relationship.  The AFL-CIO pays the Debtor a fee of $8,750 per month pursuant to a service agreement.  The Debtor may develop other client relationships in the future.  The Debtor also plans to either make efforts to collect on accounts receivable, which the Debtor currently values at $20,000, or to sell its accounts receivable.  The Debtor's only employee is Bradley Bauman, who is also the Debtor's only shareholder, director or officer.  Mr. Bauman operates the Debtor from his home (without charging rent) and does not draw salary.  He will not draw any salary during the term of this Plan.  The Debtor does not expect to incur any significant operating costs during the term of this Plan.  After factoring in projected administrative expenses, the Debtor expects to have projected disposable income (as defined by Section 1191(b) of the Bankruptcy Code) of nearly $400,000 over the 4.5-year term of the Plan.  *See* 11 U.S.C. § 1191(c)(2).

7.02    With reference to Section 1123(a)(5) of the Bankruptcy Code, the Debtor states as follows:

(A)    The Debtor will retain the office furniture and equipment that is necessary for it to continue its business, as well as funds in its debtor-in-possession account (subject to the projections in Exhibit A).

(B)    The Debtor does not expect to transfer any property of the estate except to pay administrative expenses and make distributions, as projected in Exhibit A.  The Debtor currently stores old office furniture and obsolete computer equipment, none of which has any market value, in a storage unit leased by Bradley Bauman.  The Debtor intends to abandon this personal property by arranging for its disposal.

(C)    The Debtor does not intend to merge or consolidate with any other person.

(D)    *See* section 7.02(B) of this Plan.

(E)    The Debtor has entered into settlement agreements with Channel Partners Capital, LLC, American Express National Bank and Headway Capital, LLC, under which all three of these creditors have agreed to relinquish all of their security interests in property of the estate.  The Court has approved the Debtor's settlement agreements with Channel Partners Capital, LLC and Headway Capital, LLC.  The Debtor has filed a motion for the Court to approve its settlement agreement with American Express National Bank.  The Debtor propose to satisfy the security interest of Bradley Bauman and Autumn Campbell by paying their secured claim in full, without interest, as provided above.

(F)    Not applicable.

(G)    Not applicable.

(H)    Not applicable.

(I)    The Debtor does not intend to amend its articles of incorporation.

(J)      The Debtor does not intend to issue any new securities.

## ARTICLE 8: GENERAL PROVISIONS

8.01    <u>Term</u>.  The term of this Plan shall commence on the Effective Date and shall expire on the earlier to occur of (a) the date that is fifty-four (54) calendar months after the Effective Date and (b) completion by the Debtor of all of the payments projected in Exhibit A of the Plan.  Exhibit A schedules distributions of the Debtor's projected disposable income over a 54-month period based on projections made on the date of this Plan.  Nothing in this Plan shall prohibit the Debtor from making payments earlier than the dates of such payments projected in Exhibit A if the Debtor's actual disposable income at any time during the term of the Plan exceeds its current projections.  Nothing in this Plan requires the Debtor to make any payments to creditors in excess of the applicable total amounts contained in Exhibit A.

8.02    <u>Definitions and Rules of Construction</u>.  Except with respect to the definitions of Capitalized Terms included in this Plan, the definitions and rules of construction set forth in Sections 101 and 102 of the Bankruptcy Code shall apply to this Plan.

8.03    <u>Effective Date</u>.  The date on which this Plan becomes effective (the "**Effective Date**") is the date that is fourteen (14) days after the date of confirmation of the Plan or, if that date is not a business day, the first business day thereafter; <u>provided, however</u>, that if a stay of the confirmation order is in effect on the date when the Plan would otherwise become effective, then the Plan shall become effective on the first business day after the date on which the stay expires or is otherwise terminated.

8.04    <u>Severability</u>.  If any provision of this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision in this Plan.

8.05    <u>Binding Effect</u>.  The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

8.06    <u>Captions</u>.  The headings contained in this Plan are for the convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.07    <u>Governing Law.</u>  This Plan shall be governed under, and interpreted with reference to, applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Columbia, and any other applicable laws; and otherwise governed under, and interpreted with reference to, the laws of the District of Columbia, without giving reference to any conflict-of-law principles thereof.

8.08    <u>Corporate Governance</u>.  The Debtor shall amend its bylaws to include (A) a provision prohibiting the issuance of nonvoting equity securities and; (B) unless already so provided, providing, as the one or more classes of securities possessing voting power, an

18

appropriate distribution of such power among such class(es), including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

8.09    Retention of Jurisdiction.   The Court shall retain jurisdiction to resolve any disputes arising under this Plan.

8.10    Estimates, Assumptions and Projections.   All estimates, assumptions and projections made by the Debtor in this Plan are based on the best information available to the Debtor as of the date of this Plan, and are non-binding.

## ARTICLE 9: DISCHARGE

9.01    If the Debtor's Plan is confirmed under Section 1191(a) of the Bankruptcy Code, then, on the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in Section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged from any debt: (i) imposed by this Plan; or (ii) to the extent provided in Section 1141(d)(6) of the Bankruptcy Code.

9.02    If the Debtor's plan is confirmed under Section 1191(b) of the Bankruptcy Code, then confirmation of Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on  completion of all payments due within the first 3 years of this Plan, or as otherwise provided in Section 1192 of the Bankruptcy Code.  The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first three years of the plan, or as otherwise provided in Section 1192; or (ii) excepted from discharge under Section 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE 10: OTHER PROVISIONS

10.01    Disbursing Agent.

a.       If the Plan is confirmed consensually pursuant to Section 1191(a) of the Bankruptcy Code, then, subject to Section 10.01(b) of this Plan, the Debtor shall be the disbursing agent and shall compensate itself at a rate of Two Hundred Dollars ($200) per disbursement for its time and expenses performing this service.

b.       If (1) the Plan is confirmed consensually pursuant to Section 1901(a) of the Bankruptcy Code, (2) Special Counsel elects to pursue recovery actions on behalf of the Debor, and (3) Special Counsel succeeds in recovering cash or the equivalent of cash for the estate from settlements or judgments resulting from such recovery actions, then, without the need for further application to the Court, Lannan Legal shall serve as the disbursing agent solely for such funds.  Special Counsel shall forward any amounts it recovers to Lannan Legal, which shall deposit such funds in a client trust account, which may be the Interest on Lawyers Trust Account (IOLTA) that Lannan Legal maintains for

its clients. For each disbursement under the Plan, each of Lannan Legal and the Debtor shall, in consultation with the other, make a portion of distribution, *pro rata* based on the availability of funds after disbursing fees are withdrawn by both as provided in Section 10.01. If Lannan Legal provides disbursing services pursuant to this Section 10.01(b), then Lannan Legal shall be entitled to the same disbursing fees to which the Subchapter Trustee would be entitled if the Subchapter V Trustee performed disbursing services under Section 10.01(c). Lannan Legal will not be required to apply to the Court for approval of either this appointment as disbursing agent or such fees.

       c.     If the Plan is confirmed pursuant to Section 1191(b) of the Bankruptcy Code, then the Subchapter V Trustee shall be the disbursing agent, and shall be entitled to disbursing fees in the following amounts: (1) $1,500 per month for the first four months after the Effective Date; (2) $2,500 for each quarterly distribution thereafter. The Subchapter V Trustee will not be required to apply to the Court for approval of either this appointment as disbursing agent or such fees.

       d.     It is acknowledged that the projections in Exhibit A presume that (1) the Plan will be confirmed consensually and (2) Special Counsel will not pursue and recover funds from any recovery action. If either of these conditions is not satisfied, the estate will incur additional fees for disbursing services, as provided in this Section 10.01, and this will result in lower distributions to general unsecured creditors.

10.02  <u>Disputed Claims</u>. The Debtor's deadline to object to claims shall be thirty (30) days after the Court enters an order confirming this Plan.

10.03  <u>Deadline to File Fee Applications</u>. Each professional whose engagement by the Debtor has been authorized by the Court shall file its final fee application not later than sixty (60) days after the Court enters an order confirming this Plan.

10.04  <u>Subchapter V Trustee</u>. If this Plan is confirmed pursuant to Section 1192(a), then the Subchapter V Trustee shall be discharged upon substantial consummation of the Plan. If this Plan is confirmed pursuant to Section 1192(b), then the Subchapter V Trustee shall be discharged the Subchapter V Trustee has completed all disbursements under the Plan.

10.05  <u>Default, Cure Right, Remedies</u>.

       a.     If the Debtor defaults in performance of any of its obligations under this Plan, a creditor or other party in interest may file a notice in the Case identifying the default (a "**Default Notice**") and serve the Default Notice on the Debtor and Lannan Legal. Service of the Default Notice on the Debtor shall be made by FedEx or another commercially reputable overnight delivery service, addressed to RepMGMT, Inc. Chartered, 300 Morse Street, N.E., Apt. 621, Washington, D.C. 20002, Attn: Bradley Bauman. Service of the Default Notice on Lannan Legal shall be made via the Court's CM/ECF system, or by FedEx or another commercially reputable overnight delivery service, addressed to Lannan Legal PLLC, 1717 K Street, N.W., Suite 900, Washington, D.C. 20006, Attn: Robert W. Lannan. If the Debtor disputes that a default alleged in a

Default Notice has occurred, then the Debtor may, within ten (10) business days after receipt of the Default Notice, file a response, and seek any other relief from the Court to which the Debtor is entitled under applicable laws.  The Debtor shall also have the right to cure any default identified in a Default Notice within thirty (30) days after receipt of a Default Notice, provided that if the default is failure to make a payment, the cure period shall be sixty (60) days.

      b.      If a party in interest has duly served a Default Notice and the Debtor fails to timely cure any default identified in the Default Notice, then the party in interest that filed the Default Notice may seek any relief in the Case to which it is entitled under the Bankruptcy Code, including Section 1112 thereof, or other applicable law.

10.6   <u>Adjustments for Tax Claims</u>.  It is acknowledged that the deadline for government agencies to file proofs of claim in this Case is not until June 10, 2024.  If (1) one or more government agencies file proofs of claim between the date of this Plan and that deadline (including any extensions thereof), (2) such claim(s) are in excess of the amount(s) scheduled in the Debtor's current Schedule D for such claimant(s), and (3) such claim(s) are allowed, then the Debtor shall be permitted to make *pro rata* adjustments to payments of all creditors under this Plan in accordance with the priorities of this Plan and otherwise in accordance with Section 507 of the Bankruptcy Code.

Respectfully submitted,

Dated: June 12, 2023

**REPMGMT INC. CHARTERED**,
d/b/a Fireside Campaigns,
Debtor and Debtor-in-Possession

*/s/ Robert W. Lannan*

by: _____
    Robert W. Lannan (D.D.C. Bar. No. 454965)
    Lannan Legal PLLC
    1717 K Street, N.W., Suite 900
    Washington, D.C. 20006
    Tel.: (202) 223-8901
    Fax: (202) 747-7760
    Email: robert.lannan@lannanlegal.com

*Counsel to the Debtor and Debtor-in-Possession*